# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **OGONTZ FIRE COMPANY, et al.** | |
| **Plaintiffs,** | |
| **v.** | **CIVIL ACTION NO.  23-569** |
| **CHELTENHAM TOWNSHIP, et al.** | |
| **Defendants.** | |

## MEMORANDUM OPINION

**Rufe, J.**                                                                 **March 14, 2024**

Plaintiffs Ogontz Fire Company and Arthur Gordon filed suit against Cheltenham Township, the Board of Commissioners of Cheltenham Township, and the Cheltenham Township Fire Board, alleging constitutional violations under 42 U.S.C. § 1983 and various state law violations. The claims arise from the Board of Commissioners' decertification of Ogontz Fire Company. Defendants have moved to dismiss the Complaint. For the reasons stated below, Defendants' motion to dismiss will be granted in part and denied in part.

## I.    BACKGROUND

### A.  Factual Background

The following facts, as alleged in Plaintiffs' Complaint, are taken as true for purposes of deciding Defendants' motion to dismiss. Cheltenham Township is a home rule township in Montgomery County, Pennsylvania, organized under the Pennsylvania Home Rule Charter and Optional Plans Law.[1] The Board of Commissioners of Cheltenham Township ("BOC") governs

---

[1] Act of April 13, 1972, *as amended*, *formerly* 53 Pa. Stat. §§ 1-101–1-1309, *repealed by* Act of December 19, 1996, P.L. 1158, No. 177, § 2(a). A similar act is now found in 53 Pa. Cons. Stat. §§ 2901–3171.

the Township and is composed of seven elected Commissioners.[2] The BOC also appoints a Township Manager, who serves as the chief administrative official of the Township.[3]

The Cheltenham Township Fire Department provides fire protection and firefighting services to the Township and its residents. During the relevant period, the Fire Department consisted of five all-volunteer fire companies: Glenside Fire Company (Station 1), LaMott Fire Company (Station 2), Elkins Park Fire Company (Station 3), Cheltenham Hook and Ladder Company (Station 4), and Ogontz Fire Company (Station 5).[4] Each of the fire companies had its own Fire Chief, but there was no single Chief of the entire Fire Department.[5] The Township separately employed a Fire Marshal who reported directly to the Township Manager, who in turn reported directly to the BOC.[6]

The Cheltenham Township Fire Board was established by the BOC to make recommendations, through the BOC's Public Safety Committee, about the administration and management of the Fire Department.[7] During the relevant period, the Fire Board met monthly.[8] Before the events giving rise to this lawsuit, the Fire Board consisted of nine voting members— the five Fire Chiefs of the fire companies, the BOC Commissioner who serves as Chairman of the Public Safety Committee, and three other BOC Commissioners.[9]

---

[2] Compl. ¶¶ 17–18 [Doc. No. 1].

[3] *See* Cheltenham Twp., Pa., Code § 5-16 (2021).

[4] Compl. ¶ 39 [Doc. No. 1].

[5] *Id.* ¶ 72.

[6] *Id.* ¶ 73.

[7] *See* Cheltenham Twp., Pa., Code §§ 22-3, 22-4 (2021); Compl. ¶¶ 22, 26, 72, 95 [Doc. No. 1].

[8] Compl. ¶ 95 [Doc. No. 1]; *see also* Cheltenham Twp., Pa., Code § 22-3(B) (2021) ("The Fire Board shall meet monthly . . . .").

[9] Compl. ¶ 22 [Doc. No. 1].

1. <u>Ogontz Fire Company and Property Ownership</u>

Plaintiff Ogontz Fire Company ("Ogontz Fire") is a private not-for-profit Pennsylvania corporation.[10] Its Charter, as approved and recorded by a Judge of Montgomery County, states that "[t]he corporation is desirous of holding and owning real estate for the purpose of using it and enjoying it as a fire engine and hose house and a place of meeting for the transaction of business of the corporation by its members . . . ."[11] On December 19, 1974, Ogontz Fire entered into an Indenture with the Township for the land bounded by Green Briar Road, Old York Road Spur, and Old York Road ("Ogontz Property").[12] The Indenture, which was recorded in the Recorder of Deeds, provides a 99-year lease for the Ogontz Property and states as follows:

> TO HAVE AND TO HOLD the said premises for and during the term of ninety-nine (99) years [. . .]
>
> 3. The Lessor [Township] hereby covenants with the Lessee [Ogontz Fire] as follows: (1) That the said Lessee on paying the said yearly rent [of $1.00] and performing said covenants on his part shall and may peaceably and quietly have, hold and enjoy the demised premises during the term aforesaid.[13]

On March 5, 1980, Ogontz Fire entered into a Memorandum of Understanding with the Township, which documented Ogontz Fire's agreement to sell its previous firehouse at the corner of York and Church Roads and to construct a new firehouse at its own expense at a cost not to exceed $500,000.[14] In return, the Township conveyed its intent to purchase the new firehouse after its construction at a price equal to its construction costs, after which Ogontz Fire would lease the firehouse back from the Township for amortized rental payments over

---

[10] *Id.* ¶ 12.

[11] *Id.* ¶ 33.

[12] *Id.* ¶¶ 43, 35.

[13] *Id.* ¶¶ 42–45.

[14] *Id.* ¶ 49.

20 years.[15] The Memorandum of Understanding contemplated that Ogontz Fire would have the right to purchase the firehouse for $1.00 upon completion of the 20-year lease.[16]

On December 24, 1980, Ogontz Fire and the Township entered into a Lease-Purchase Agreement, whereby Ogontz Fire lease-purchased the new firehouse for 20 years.[17] The Lease-Purchase Agreement incorporated the Indenture, including Ogontz Fire's continuing 99-year lease of the Ogontz Property, but the Agreement did not contain any provisions requiring that the property be used as a firehouse.[18] Ogontz Fire made its annual payments over 20 years, totaling $960,986.50—$500,000 in principal and $460,986.50 in interest.[19] In 2000, at the end of the 20-year period, Ogontz Fire purchased the firehouse for $1.00.[20] Plaintiffs contend that, in addition to Ogontz Fire's ownership of the firehouse, Ogontz Fire also has a continuing right to use the Ogontz Property pursuant to the 99-year lease, until on or about December 19, 2073.[21]

2. <u>Pennsylvania Department of Community and Economic Development Report</u>

In 2019, the Township requested that the Pennsylvania Department of Community and Economic Development ("DCED") conduct an assessment of Cheltenham's fire services.[22] Plaintiffs contend that the request was because of the Township's financial troubles rather than fire safety concerns.[23] In August 2020, while the DCED's review was ongoing, Defendants—in

---

[15] *Id.* ¶¶ 49–50.

[16] *Id.* ¶ 50.

[17] *Id.* ¶¶ 51, 53.

[18] *Id.* ¶¶ 52, 53–54.

[19] *Id.* ¶ 55.

[20] *Id.* ¶ 56.

[21] *Id.* ¶¶ 57, 59–60, 379, 381.

[22] *Id.* ¶ 61.

[23] *Id.* ¶ 62 (citing the Township's June 17, 2020 Five-Year Financial Management Plan).

particular, a BOC Commissioner named Mitchell Zygmund-Felt—insisted on the termination of an Ogontz Fire Lieutenant because of a certain incident between the Lieutenant and a resident over a false alarm.[24] Plaintiffs allege that, after Ogontz Fire suspended the Lieutenant instead of terminating him, Commissioner Zygmund-Felt and the other Defendants were angry, developed a personal animus against the Lieutenant, and "began a pattern and conspiracy to destroy Ogontz Fire" in retaliation for how the incident was handled.[25]

In November 2020, the DCED issued its Report.[26] The Report recommended that the Township hire a Municipal Fire Chief to oversee a unified administration of the five fire companies.[27] The Report also recommended that three of the fire companies—LaMott, Elkins Park, and Ogontz—should operate as a single entity through the creation of an Association.[28] The Report did not, however, suggest the elimination of any fire company.[29]

3. December 8, 2020 – Initial Fire Board Decisions

On November 5, 2020, Kevin Lynch, then-Fire Chief of Ogontz Fire and brother of Cheltenham Fire Marshal Scott Lynch, announced that he was resigning from his position effective December 31, 2020.[30] He was to move into a new role as Chief of LaMott Fire

---

[24] *Id.* ¶¶ 86–88.

[25] *Id.* ¶¶ 91–93.

[26] *Id.* ¶ 65.

[27] *Id.* ¶ 74.

[28] *Id.* ¶¶ 70, 74.

[29] *Id.* ¶ 71. The Report, as quoted in the Complaint, specifically recommended an "Association" by "[a]greement of two or more companies to combine and administer similar activities through an umbrella organization," which "does not normally involve transfers or combination of assets, as most costs of operations or programs are shared." *Id.* ¶ 76. The DCED explicitly did not recommend a "Merger" or "Consolidation," which would have required name changes and the transfer of assets and liabilities, nor did it recommend "Regionalization," whereby participating companies could retain their identities but assets would be combined to accomplish specific objectives and tasks. *Id.*

[30] *Id.* ¶ 105.

Company effective January 1, 2021.[31] Plaintiffs allege that Kevin Lynch's resignation, which led to a gap in coverage in Ogontz Fire's leadership, was in fact part of Defendants' "orchestrated" conspiracy against Ogontz Fire that stemmed from the earlier dispute concerning the suspended Lieutenant.[32] Plaintiffs further allege that, over the following months, the BOC, the Fire Board, the Lynch brothers, and then-Township Manager Robert Zienkowski took steps to advance this conspiracy, culminating in the decertification of Ogontz Fire.[33]

For instance, Plaintiffs allege that an unnamed Ogontz Fire Captain was next in line for an internal promotion to the Chief position after Kevin Lynch's departure, but when the Captain applied to act as Interim Chief, the Fire Board denied the application.[34] Then, when an unnamed Deputy Chief of the neighboring LaMott Fire Company ("LaMott Deputy Chief")—a Black firefighter with leadership experience—proposed a lateral transfer to Ogontz Fire so that he could fill the Chief vacancy as an external candidate, he was notified on or about December 8, 2020 that the Fire Board had denied the transfer request.[35] The Complaint states that the LaMott Deputy Chief was highly experienced, "eminently qualified" for the new Ogontz Chief position, and "was the only minority candidate in the Township who met all requirements and could fill

---

[31] *Id.* The Complaint contends that LaMott Fire Company was a historically Black fire company, and it suggests that Defendants acted in bad faith by permitting Kevin Lynch, who is white, to assume the leadership position of LaMott. *Id.* ¶ 156. According to the Complaint, "[t]he Village of LaMott was listed on the National Register of Historic Places in 1985 as an important landmark in American black history." *Id.* ¶ 99.

[32] *Id.* ¶¶ 93, 108.

[33] *See id.* ¶¶ 108–59.

[34] *Id.* ¶¶ 109–10.

[35] *Id.* ¶¶ 111, 113, 115. The Complaint states that Fire Marshal Scott Lynch first notified Ogontz President Arthur Gordon about the transfer denial, who then passed along the news to the LaMott Deputy Chief. *Id.* ¶ 115.

this role immediately."[36] Plaintiffs allege that the transfer denial was driven by racial discrimination.[37]

Plaintiffs further allege that the Fire Board's denial of the LaMott Deputy Chief's lateral transfer request was procedurally deficient. First, the Complaint states that the Fire Board "curiously cancelled its regular monthly meeting" in December 2020 and would not meet again (at least formally) until January 7, 2021.[38] Second, Plaintiffs allege that Fire Marshal Scott Lynch conspired with his brother Kevin Lynch "and undisclosed others" to act as a *de facto* Fire Board on or about December 8, 2020, with the participation of only two Fire Chiefs, in violation of the Township Code governing the required number of voting members.[39]

On December 9, 2020, the LaMott Deputy Chief sent an email to Fire Marshal Scott Lynch, Township Manager Robert Zienkowski, Township Director of Human Resources Charlyn Battle, Commissioner Irv Brockington, and Ogontz Fire President Arthur Gordon, which: (a) "expressed . . . concerns that the purported [Fire Board] decision was not in the best interest of safety for the public"; (b) conveyed that the Fire Board's actions "strongly suggest some very negative and ugly undertones"; (c) "questioned whether there was an ulterior motive for the demise of Ogontz Fire"; and (d) noted that previous lateral transfer requests by white firefighters

---

[36] *Id.* ¶¶ 113–14. The Complaint notes that the LaMott Deputy Chief had in fact previously served as the Chief of LaMott Fire Company before assuming the Deputy role. *Id.* ¶ 113.

[37] *See, e.g.*, *id.* ¶¶ 159, 365(f), 393; *see also id.* ¶ 124.

[38] *Id.* ¶¶ 95–96, 118.

[39] *Id.* ¶¶ 97, 115–18; *see also id.* ¶ 136 ("Clearly, Fire Marshal Scott Lynch, who is the brother of Chief Kevin Lynch, spoke informally with unidentified other Fire Chiefs, and improperly denied the lateral transfer . . . ."); *id.* ¶ 147 (describing the December 8, 2020 decision as having been made "by only two (2) of the required nine (9) voting [Fire Board] members . . . illegally and in secret").

had been approved, but his request, the only one submitted by a Black firefighter, was the only one to ever have been denied.[40] Only Ogontz President Gordon responded to the email.[41]

    4.   December 16, 2020 – First BOC Decertification Decision

On December 16, 2020, the BOC held a scheduled meeting.[42] The meeting minutes state that Fire Marshal Scott Lynch "made a presentation on the state of the Township fire companies" to the BOC and recommended that Ogontz Fire be formally decertified "[d]ue to the diminishing of responses to calls and lack of leadership . . . ."[43] In the subsequent discussion among the Commissioners, President Daniel Norris cited the DCED Report as indicating that decertification of Ogontz Fire would "improve the efficiency of fire services."[44] After public comment from only one member of the community,[45] the BOC then voted to decertify Ogontz Fire Company.[46] The BOC issued a press release after the meeting informing the public about its decision.[47]

---

[40] *Id.* ¶¶ 119–20; *see also id.* ¶¶ 98, 112.

[41] *Id.* ¶ 104.

[42] Defs.' Mot. Dismiss, Ex. B [Doc. No. 11-1] (minutes from December 16, 2020 BOC meeting), *publicly available at* https://www.cheltenhamtownship.org/files/documents/BoardofCommissionersMinutes12-16-20100448012121AM1706.pdf [https://perma.cc/C6D5-QTYG] (last accessed Feb. 26, 2024). The Court takes judicial notice of the meeting minutes from the December 16, 2020 BOC meeting and other public materials discussed henceforth, because they are referenced by the Complaint and are publicly available records. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (courts may consider "matters of public record" in determining whether a pleading has stated a claim (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004))); *see also Levins v. Healthcare Revenue Recovery Grp. LLC*, 902 F.3d 274, 279–80 (3d Cir. 2018).

[43] Defs.' Mot. Dismiss, Ex. B at 8 [Doc. No. 11-1].

[44] *Id.* at 9.

[45] Neither the parties nor the documents of record indicate that Ted Cerebi, the public commenter at the December 16, 2020 meeting, had any personal affiliation with Ogontz Fire. *See id.*

[46] *Id.* (meeting minutes stating that the vote was 6-0-1, upon motion of President Daniel Norris).

[47] *See* Press Release, Cheltenham Twp., Pa., Cheltenham Township Decertified Ogontz Fire Company (Dec. 16, 2020) [hereinafter Dec. 16, 2020 Press Release], https://www.cheltenhamtownship.org/newsview.aspx?nid=6225 [https://perma.cc/23NS-PCRV] (last accessed Feb. 9, 2024).

Plaintiffs raise two procedural deficiencies regarding the December 16, 2020 meeting. First, Plaintiffs contend that the December 16, 2020 decertification vote failed to provide Ogontz Fire and its members with notice and opportunity to be heard.[48] Plaintiffs allege that "[t]he agenda for the . . . meeting contained no reference or mention of the decertification of Ogontz Fire," meaning there was no advance notice to the public.[49] Second, Plaintiffs contend that the BOC failed to obtain a report and recommendation from either the Fire Board or the Public Safety Committee in advance of the vote, as required under the Township Code.[50]

### 5.  January 7, 2021 – Fire Board Meeting

On January 7, 2021, the Fire Board held its monthly meeting.[51] The meeting agenda included an entry for the LaMott Deputy Chief's email criticizing the transfer denial.[52] According to Plaintiffs, Fire Marshal Scott Lynch admitted that the Deputy Chief "was the first person in Cheltenham Township history that asked for a lateral transfer who is of African American descent and [was] denied," and that "there has never been any other denial ever of a lateral transfer . . . ."[53] Ultimately, however, Plaintiffs allege that Scott Lynch dismissed the protests as "a moot point" given the BOC's "final" decertification decision on December 16, 2020.[54]

---

[48] Compl. ¶ 123 [Doc. No. 1].

[49] *Id.* ¶¶ 123, 173–74, 176 [Doc. No. 1].

[50] *Id.* ¶¶ 171–72.

[51] *Id.* ¶ 129.

[52] *Id.* Plaintiffs also reference separate meetings held by the Township's Human Relations Committee ("HRC") on January 7, 2021 and February 4, 2021. *See id.* ¶¶ 150–51, 183–85. Plaintiffs contend that the LaMott Deputy Chief's email and allegations of racial discrimination were not discussed at either meeting. *Id.*

[53] *Id.* ¶¶ 132–33.

[54] *Id.* ¶ 134.

Plaintiffs allege that the Fire Board may also have participated in a vote during the January 7, 2021 meeting, but the Complaint is unclear as to the precise subject matter of the vote, who on the Fire Board participated in the vote, and the ultimate outcome of the vote.[55] The Complaint generally suggests that the Fire Board "convened . . . to 'confirm'" the allegedly "secret and illegal" December 8 decision by the two unidentified Fire Chiefs, specifically by rejecting Ogontz Fire's two proposals to fill the vacant Chief position—either through the internal promotion of the Ogontz Fire Captain or the lateral hire of the LaMott Deputy Chief.[56] The Complaint also states that only "*four* (4) [Fire Board] members out of the eight (8) voting members present participated in the mandatory voting process,"[57] because none of the BOC Commissioners at the meeting voted, another BOC Commissioner (Irv Brockington, Chair of Public Safety) failed to appear, and Ogontz President Arthur Gordon "was prevented from voting, even though he should have been allowed to vote . . . as the alternate to the missing Chief of Ogontz Fire" under Section 22-3(C) of the Cheltenham Township Code.[58]

6. <u>March 17, 2021 – BOC Adoption of Decertification Ordinance</u>

After the Fire Board meeting, Ogontz Fire made efforts to cure the deficiencies that the BOC had identified.[59] Ogontz Fire recruited new volunteers and, on February 4, 2021, it promoted one of its members to take over the Chief position—an individual who Plaintiffs claim

---

[55] *See generally id.* ¶¶ 138–49.

[56] *Id.* ¶¶ 142–43, 146.

[57] *Id.* ¶ 149 (emphasis added).

[58] *Id.* ¶¶ 149, 139–40, 152–54. *But see id.* ¶ 146 ("Even at the January 7, 2021 [Fire Board] meeting, the decisions to deny both Proposal 1 and Proposal 2 were still made by only two (2) ***unidentified*** Fire Chiefs of the five (5) required to be on the [Fire Board].").

[59] *Id.* ¶¶ 186–88.

"met all of the qualification[s] to be Chief . . . ."[60] Plaintiffs allege that they were then

"belatedly" notified that Defendants intended to move forward with confirming the

decertification at a March 17, 2021 BOC meeting.[61] Two days before the meeting, Ogontz Fire

requested that the BOC table the passage of any ordinance regarding the decertification.[62]

During the March 17, 2021 BOC meeting, Commissioner Ann Rappoport entered a

proposal to delay the adoption of Ordinance No. 2423-21—an Ordinance which removed Ogontz

Fire from the Township's list of recognized fire companies and would thereby finalize its

decertification.[63] After receiving public comment from thirteen members of the community

(including Plaintiff Gordon), the BOC rejected the proposal to delay the adoption of the

Ordinance by a 1-6 vote, and it adopted the Ordinance by a separate 5-2 vote.[64]

Plaintiffs contend that the March 17, 2021 Ordinance was "the final BOC decision to

decertify Ogontz Fire," rather than the December 16, 2020 decertification vote or any other

previous actions by the Township.[65] Plaintiffs further allege that, in any event, the March 17,

2021 decision was "another pre-determined sham" and merely a "confirm[ation]" of Defendants'

"previous arbitrary, capricious and unconstitutional conduct . . . ."[66] Finally, Plaintiffs allege that

the BOC "demand[ed] surrender of the Ogontz Property and Ogontz fire house, and various

---

[60] *Id.*

[61] *Id.* ¶ 189.

[62] *Id.*

[63] Defs.' Mot. Dismiss, Ex. F at 3–5 [Doc. No. 11-1] (minutes of March 17, 2021 BOC meeting), *publicly available at* https://www.cheltenhamtownship.org/files/documents/BoardofCommissionersMinutes03-17-21120159041521PM1706.pdf [https://perma.cc/NFK5-NL2M] (last accessed Feb. 26, 2024); *see also* Defs.' Mot. Dismiss, Ex. G at 2 [Doc. No. 11-1] (Ordinance No. 2423-21).

[64] Defs.' Mot. Dismiss, Ex. F at 3–5 [Doc. No. 11-1]; *see also* Compl. ¶ 190 [Doc. No. 1]; Defs.' Mot. Dismiss, Ex. G [Doc. No. 11-1].

[65] Compl. ¶ 135 [Doc. No. 1].

[66] *Id.* ¶¶ 192, 190.

items of equipment" after the Ordinance was adopted, and "shortly before the filing of this

Complaint, Defendants confirmed additional demands that they also take Ogontz Fire's monetary

funds, all of its equipment, and 'full dissolution' of Ogontz Fire."[67]

### B. Procedural Background

On February 4, 2021, before the BOC adopted the Ordinance finalizing the

decertification, Ogontz Fire filed a lawsuit in the Montgomery County Court of Common

Pleas.[68] The state complaint sought "a declaration that the decertification of its fire company

which occurred on December 16, 2020 was improper and that Ogontz Fire Company is reinstated

as a certified and operating Fire Protection entity in the Township of Cheltenham."[69] On

February 12, 2021, Ogontz Fire filed an "Emergency Petition for Preliminary Injunction."[70] On

February 24, 2021, the Honorable Steven C. Tolliver held a hearing on the Petition via Zoom.[71]

On March 1, 2021, Judge Tolliver denied the Emergency Petition.[72] The case remains open, but

there has been no substantive activity in the state case since May 6, 2021.[73]

On December 14, 2022, the Township, Ogontz Fire, and Arthur Gordon executed a

Tolling Agreement which extended any limitations period for Plaintiffs' potential claims by

---

[67] *Id.* ¶ 190–91.

[68] Docket, *Ogontz Fire Co. v. Township of Cheltenham*, No. 2021-01343 (C.P. Mont. Cnty.); *see also* Defs.' Mot. Dismiss, Ex. C [Doc. No. 11-1] (complaint in state action).

[69] Defs.' Mot. Dismiss, Ex. C at 3 [Doc. No. 11-1].

[70] Docket, *Ogontz Fire Co. v. Township of Cheltenham*, No. 2021-01343 (C.P. Mont. Cnty.); *see also* Defs.' Mot. Dismiss, Ex. D [Doc. No. 11-1] (Plaintiff Ogontz Fire Company's Emergency Petition in state action).

[71] Defs.' Mot. Dismiss, Ex. E [Doc. No. 11-1] (March 1, 2021 order in state action).

[72] *Id.*

[73] The last docket entry is a February 29, 2024 administrative notice to terminate, but the case remains open. Before that, the most recent entries are the filing of an amended answer by the Township on May 6, 2021, and an entry of appearance by counsel for the Township on January 10, 2022. Docket, *Ogontz Fire Co. v. Township of Cheltenham*, No. 2021-01343 (C.P. Mont. Cnty.).

60 days.[74] Plaintiffs filed their Complaint in this Court in February 2023.[75] Defendants then filed a motion to dismiss for failure to state a claim, which was fully briefed and is now ripe for decision.[76] The Court now considers Defendants' motion to dismiss.

## II.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[77] A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[78] A plaintiff's "allegations must be enough to raise a right to relief above the speculative level"; something more than a mere *possibility* of a claim must be alleged.[79] The complaint must set forth "direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory."[80] At the motion to dismiss stage, courts are not tasked with assessing the probability of whether the alleged facts can or will be proved.[81] Rather, the standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the

---

[74] Defs.' Mot. Dismiss, Ex. H [Doc. No. 11-1] (Tolling Agreement).

[75] Compl. [Doc. No. 1].

[76] Defs.' Mot. Dismiss [Doc. No. 11]; Pls.' Resp. Opp'n Mot. Dismiss [Doc. No. 13]; Defs.' Reply Supp. Mot. Dismiss [Doc. No. 14].

[77] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[78] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[79] *Twombly*, 550 U.S. at 555 (citations omitted).

[80] *Id.* at 562 (quotation marks and citations omitted).

[81] *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

necessary element" of a claim.[82] The question is not whether the plaintiff ultimately will prevail but whether the complaint is "sufficient to cross the federal court's threshold."[83]

In determining whether a motion to dismiss should be granted, the court must consider only those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[84] Courts are not, however, bound to accept as true legal conclusions framed as factual allegations.[85] At the motion to dismiss stage, "courts generally consider only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."[86]

## III.   DISCUSSION

### A.   Standing[87]

Plaintiffs have brought federal claims under 42 U.S.C. § 1983 against Cheltenham Township, the Township's Board of Commissioners, and the Township's Fire Board. Section

---

[82] *Id.* (quotation marks omitted) (quoting *Twombly*, 550 U.S. at 556).

[83] *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation omitted). At the motion to dismiss stage, a court determines only whether a plaintiff will be permitted to seek evidence in support of the claims in the complaint. *See Twombly*, 550 U.S. at 556, 558–59.

[84] *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *Fay v. Muhlenberg Coll.*, No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[85] *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Twombly*, 550 U.S. at 555.

[86] *Brown v. Daniels,* 128 F. App'x 910, 913 (3d Cir. 2005) (quotation marks omitted) (quoting *Lum v. Bank of Am.,* 361 F.3d 217, 221 n.3 (3d Cir. 2004)); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

[87] Defendants erroneously raise standing arguments in a motion to dismiss brought under Rule 12(b)(6) for failure to state a claim. "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007); *see also In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 733 (3d Cir. 1970) ("[W]e must not confuse requirements necessary to state a cause of action . . . with the prerequisites of standing.").

Nevertheless, because "[t]he issue of standing is jurisdictional," the Court will address the parties' briefed arguments in accordance with the Rule 12(b)(1) standard. *St. Thomas–St. John Hotel & Tourism Assoc., Inc. v. Gov't of the U.S. V.I.*, 218 F.3d 232, 240 (3d Cir. 2000); *see also Steele v. Blackman*, 236 F.3d 130, 134 n.4 (3d Cir. 2001) (holding that, even in the absence of a challenge, courts are "required to raise issues of standing sua sponte if such issues exist") (citing *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996)).

1983 is not a source of substantive rights, but a means of vindicating violations of federal constitutional and statutory rights committed by state actors.[88] To state such a claim, Plaintiffs therefore must allege (1) a deprivation under the Constitution or laws of the United States, (2) by a person acting under color of state law.[89] In addition, Plaintiffs allege claims under Pennsylvania state law for negligence and breach of contract.

Article III of the Constitution authorizes federal courts to hear "[c]ases" and "[c]ontroversies."[90] "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing."[91] The standing requirement forces plaintiffs "to sufficiently answer the question: 'What's it to you?'"[92] This requirement "prevents courts of law from undertaking tasks assigned to the political branches,"[93] and ensures that they "do not adjudicate hypothetical or abstract disputes" or act as "roving commission[s]" free to "publicly opine on every legal question."[94] The Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements."[95] "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[96]

---

[88] *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citation omitted).

[89] *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

[90] U.S. Const. art. III, § 2, cl. 1.

[91] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quotation marks omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).

[92] *TransUnion*, 594 U.S. at 423 (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)).

[93] *Lewis v. Casey*, 518 U.S. 343, 349 (1996) (citations omitted).

[94] *TransUnion*, 594 U.S. at 423.

[95] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[96] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing *Lujan*, 504 U.S. at 560–61).

"It is the plaintiffs' burden, at the pleading stage, to establish standing,"[97] by "alleg[ing] facts that affirmatively and plausibly suggest that [they] ha[ve] standing to sue."[98] Plaintiffs must meet this burden "for each type of relief sought."[99] If Plaintiffs allege constitutional claims under § 1983, they must establish violations of the particular constitutionally protected interests underlying each claim.[100] Moreover, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."[101] Therefore, because the Court now addresses a facial challenge to standing, it "appl[ies] the same standard as on review of a motion to dismiss under Rule 12(b)(6)."[102] The Court must consider only the facts pleaded in the Complaint and the documents referenced therein and attached thereto, viewed in the light most favorable to Plaintiffs.[103]

---

[97] *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011) (citations omitted).

[98] *Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016) (quoting *Amidax Trading Grp. v. SWIFT SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).

[99] *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted).

[100] *Associated Builders and Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 288 (3d Cir. 2023) [hereinafter *ABC*] ("[A] plaintiff has standing to bring a First Amendment claim when he suffers injury to his legally protected First Amendment interest—*e.g.*, when the state forces him to speak, . . . or associate . . . ." (citations omitted)).

[101] *Lujan*, 504 U.S. at 561 (citations omitted).

[102] *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (citing *Petruska v. Gannon Univ.*, 462 F.3d 294, 299 n.1 (3d Cir. 2006)).

[103] *Finkelman*, 810 F.3d at 194 ("When assessing standing on the basis of the facts alleged in a complaint, this means we apply the same standard of review we use when assessing a motion to dismiss for failure to state a claim.") (citing *In re Schering Plough Corp.*, 678 F.3d at 243); *see also Richard Roe W.M. v. Devereux Found.*, 650 F. Supp. 3d 319, 326 n.3 (E.D. Pa. 2023).

1.   Claims by Ogontz Fire for Its Own Injuries

Where, as here, a plaintiff is an organization, the Supreme Court has held that "the standing requirements of Article III can be satisfied in two ways."[104] Under the first track, "the organization can claim that it suffered an injury in its own right . . . ."[105]

Defendants do not challenge Ogontz Fire's standing to assert claims under this first track—nor could they, given their concession that "the conduct at issue impacts the alleged rights of Ogontz . . . ."[106] Ogontz Fire properly alleges that it has a vested ownership interest in its firehouse, "including ingress, egress, rights of way, outbuildings, and property rights, and all of its improvements, contents, appurtenances, and other fixed and tangible and intangible assets," pursuant to its purchase of the building from the Township under the Lease-Purchase Agreement.[107] The Complaint also sufficiently alleges that Ogontz Fire has a continuing right, pursuant to its Indenture with the Township, to use the land on which the firehouse was built until at least 2073.[108]

Most of Ogontz Fire's claims arise from allegations that Defendants' conduct unconstitutionally invaded those real property interests (and infringed upon the written agreements conveying those interests). A favorable ruling would likely redress those alleged harms, whether through declaratory relief or a damages award. Therefore, Ogontz Fire has

---

[104] *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) [hereinafter *SFFA*].

[105] *Id.* (citation omitted).

[106] Defs.' Mot. Dismiss at 10 [Doc. No. 11]. *See also Lujan*, 504 U.S. at 561–62 ("When the suit is one challenging the legality of government action . . . [and] the plaintiff is himself an object of the action . . . at issue[,] . . . [then] there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing or requiring the action will redress it.").

[107] Compl. ¶¶ 57, 51, 53, 55–56, 379, 382 [Doc. No. 1].

[108] *Id.* ¶¶ 35, 42–45, 57, 59–60, 379, 381.

standing in its own right to bring its claims under the Takings Clause, Contract Clause, and Due Process Clause of the Fourteenth Amendment. For the same reasons, Ogontz Fire also has standing to bring its negligence and breach of contract claims under Pennsylvania state law.

### 2.   Claims by Ogontz Fire as a Representative / Claims by Arthur Gordon

A plaintiff entity may also rely upon a second, alternative track, known as "representational" or "organizational" standing, by "assert[ing] 'standing solely as the representative of its members.'"[109]

Defendants contest Ogontz Fire's standing to sue on behalf of its members, arguing that third-party standing is warranted only in "exceptional" circumstances, and citing precedent for the proposition that "[t]hird parties lack standing to bring claims under § 1983 for violation of the constitutional rights of another."[110] However, none of the cases Defendants cite involves an organization bringing claims on behalf of its members.[111] The Supreme Court has held that a plaintiff entity may have representational standing "[e]ven in the absence of injury to itself,"[112] but it "must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and

---

[109] *SFFA*, 600 U.S. at 199 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975); citing *Summers*, 555 U.S. at 497–98).

[110] Defs.' Mot. Dismiss at 10 [Doc. No. 11] (quotation marks omitted) (quoting *Hopson v. McVicar*, No. 17-6037, 2017 WL 4697337, at *3 (D.N.J. Oct. 19, 2017)).

[111] *See, e.g.*, *Hopson*, 2017 WL 4697337 (§ 1983 claims brought on behalf of girlfriend). The *Hopson* decision itself cites additional cases, but none of those decisions relate to organizational standing, either. *See Norcross v. Town of Hammonton*, Civ. No. 04-2536, 2006 WL 1995021 (D.N.J. July 13, 2006) (§ 1983 claims brought on behalf of arrested wife); *Pahle v. Colebrookdale Township*, 227 F. Supp. 2d 361 (E.D. Pa. 2002) (§ 1983 claims brought by spouse); *Hill v. Pa. Dep't of Corr.*, 521 F. App'x 39 (3d Cir. 2013) (§ 1983 claims brought by inmate's wife); *Reihner v. County of Washington*, 672 F. App'x 142 (3d Cir. 2016) (§ 1983 claims brought by parents).

[112] *Warth*, 422 U.S. at 511 (citing *Nat'l Motor Freight Ass'n v. United States*, 372 U.S. 246 (1963)).

(c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"[113]

Separately, Defendants contend that Arthur Gordon, President of Ogontz Fire, lacks standing to bring suit under § 1983 because the alleged harm was to the organization and not to Gordon. Defendants rely on *Grimm v. Borough of Norristown*, a decision from this District which applied the general rule that "[a] person is not entitled to bring a Section 1983 claim arising from harm suffered by the corporation, but must allege a separate harm to himself/herself personally in order to have standing."[114] The analysis for whether Gordon has standing to bring suit overlaps significantly with the representational standing analysis as to Ogontz Fire's other unnamed members. Therefore, the Court will consider them together.[115]

First, Defendants are correct that neither Gordon nor any other individual member of Ogontz Fire can assert § 1983 claims arising from real property or contractual interests held solely by the entity. Accordingly, the Court will dismiss for lack of standing Plaintiff Gordon's claims under the Takings Clause, Contract Clause, and Due Process Clause of the Fourteenth Amendment, as well as Gordon's state-law negligence and breach of contract claims.

Second, Plaintiffs bring claims under the Equal Protection Clause. Even accepting as true the facts alleged in the Complaint, none of Ogontz Fire's individual members (including Gordon) have standing to assert an equal protection claim under § 1983. The alleged facts are insufficient to suggest that any particular member of Ogontz Fire suffered from differential treatment. Notably, Plaintiffs do not purport to assert standing on behalf of the Black LaMott Deputy Chief

---

[113] *SFFA*, 600 U.S. at 199 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

[114] *Grimm v. Borough of Norristown*, 226 F. Supp. 2d 606, 632 (E.D. Pa. 2002) (citations omitted).

[115] *See Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261–62 (3d Cir. 2009).

whose transfer request was denied. That makes sense, given that the LaMott Deputy Chief remains unnamed, is not a party to this case, and is not a member of Ogontz Fire.[116] Thus, the only remaining avenue is the first track defined by the Supreme Court: Ogontz Fire must allege an injury to itself. It has done so here. The Complaint properly alleges a theory that Ogontz Fire *as a whole* was treated differently from other fire companies—not as a member of a protected class, but rather as compared to other similarly positioned fire companies in the Township.[117] The Court holds that Ogontz Fire has standing to bring an equal protection claim based only upon alleged discrimination to itself, not its unnamed members. Gordon's equal protection claim will be dismissed for lack of standing.

Third, Plaintiffs bring claims under the First Amendment. Defendants contend that Gordon has failed to allege a distinct and personal harm caused by Defendants' conduct sufficient for him to raise any of his own claims as a named party in this litigation. Plaintiffs respond that Defendants violated Gordon's "Constitutional right to associate with other firefighters, including existing and prospective members of Ogontz Fire, to engage in expressive conduct, such as promoting the exchange of ideas among those interested in fire fighting and fire prevention, promoting public welfare and good citizenry, and to spread fire safety ideas to the

---

[116] *See Amato v. Wilentz*, 952 F.2d 742, 748 (3d Cir. 1991) ("The longstanding basic rule of third party standing is that 'in the ordinary course, a litigant must assert his or her own legal rights and interests . . . .'") (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)).

[117] *See, e.g.*, Compl. ¶¶ 206, 209 [Doc. No. 1].

citizens of the Township."[118] Plaintiffs also allege that Defendants prevented members of Ogontz Fire, including Gordon, from associating with other fire companies, including Glenside.[119]

Accepting as true the facts alleged in the Complaint, Plaintiff Gordon adequately alleges an injury in fact to his own constitutional interests under the First Amendment. The Court declines to adopt the reasoning of the *Grimm* decision, which is not binding on this Court. Gordon's First Amendment claims are predicated on alleged associational interests he holds personally under that Amendment, as distinguishable from "generalized grievances shared by the public at large . . . ."[120] This is not a case where Gordon relies on allegations of "*some* factual injury" to bring § 1983 claims under unrelated constitutional provisions; rather, Gordon properly alleges "a First Amendment injury to bring a First Amendment claim."[121] While it may be that Gordon and other Ogontz members' right to associate "may be 'intangible,'" their associational right "is no less concrete when it is 'specified by the Constitution itself.'"[122]

Defendants do not challenge Ogontz Fire's standing to assert First Amendment claims based on its own associational rights or its right to be free from retaliation for engaging in protected conduct. However, to the extent that Ogontz Fire must rely upon representational standing for those claims, the Complaint sufficiently establishes its ability to do so under the

---

[118] Pls.' Resp. Opp'n Mot. Dismiss at 13 [Doc. No. 13]. Pennsylvania courts have recognized "that the duties of volunteer firefighters encompass[ ] more than the mere act of 'firefighting' . . . ." *In re Indep. Fire Co. No. 1*, No. 1489 C.D. 2018, 2020 WL 563505, at *6 n.10 (Pa. Commw. Ct. Feb. 5, 2020) (citing cases and statutes).

[119] Pls.' Resp. Opp'n Mot. Dismiss at 14 [Doc. No. 13].

[120] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 280 (3d Cir. 2014) (quotation marks omitted) (quoting *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 119 (3d Cir. 1997)); *see also ABC*, 81 F.4th at 288 ("[B]ecause Plaintiffs allege an injury to themselves, not someone else, there is no particularity issue.").

[121] *ABC*, 81 F.4th at 288.

[122] *Id.* at 289 (quoting *TransUnion*, 594 U.S. at 425).

framework established by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission*.[123]

First, given the Court's conclusion that Gordon has standing to sue in his own right, it follows that other members of Ogontz Fire would also have standing to bring First Amendment claims predicated on their own associational interests as part of their affiliation with Ogontz Fire. Second, Plaintiffs have demonstrated that the interests Ogontz Fire seeks to protect are germane to the organization's purpose. The Complaint states that Ogontz Fire's "object and purpose" as a non-profit organization includes "promot[ing] the exchange of ideas among those interested in firefighting and fire prevention in the community" and "bring[ing] to the attention of citizens of Cheltenham Township the vital importance of avoiding fire . . . ."[124] Plaintiffs adequately allege that Ogontz Fire, in seeking to enforce its members' First Amendment associational rights, is acting to protect interests that are germane to its mission. Third, the relief requested does not require individual members to participate. The third prong "is prudential, not constitutional."[125] The Court is satisfied that, as a "matter[ ] of administrative convenience and efficiency," the absent members of Ogontz Fire would benefit equally from the relief sought pursuant to Plaintiffs' First Amendment claims.[126] The Court holds that Ogontz Fire has standing to bring its First Amendment claims—based upon either its own interests or those of its absent members— and that Gordon also has standing to bring his First Amendment claims individually.

---

[123] 432 U.S. 333, 343 (1977); *see also SFFA*, 600 U.S. at 199.

[124] Compl. ¶ 34 [Doc. No. 1].

[125] *Blunt*, 767 F.3d at 289 (citing *United Food and Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996)).

[126] *United Food*, 517 U.S. at 557.

### B. *Monell* Liability[127]

Section 1983 liability against a municipal entity cannot be based on a theory of respondeat superior or vicarious liability.[128] Rather, "[a] local government may be sued under § 1983 only for acts implementing an official policy, practice or custom."[129] A plaintiff can hold a municipality, such as Cheltenham Township, liable for constitutional violations by alleging: (1) an unconstitutional policy or custom of the municipality leading to plaintiff's injuries; or (2) a failure or inadequacy by the municipality that "reflects a deliberate or conscious choice."[130]

Under the first track of *Monell* liability, a "policy" exists when a municipal decision-maker with final authority with respect to the action ordered issues an official proclamation or edict.[131] "Typically, a municipal policy is a statement, ordinance, regulation, or decision officially adopted and promulgated by a local governing body's officers."[132] It is a question of state law whether a decisionmaker has final policymaking authority for purposes of § 1983 liability.[133] A "custom" exists when "practices of state officials [are] so permanent and well settled as to virtually constitute law."[134] A custom may provide a basis for § 1983 liability "even

---

[127] Generally, a municipality cannot be held liable under § 1983 for violating a plaintiff's civil rights as a result of a municipal policy or practice unless one of the municipality's employees "is primarily liable under section 1983 itself." *Williams v. Borough of W. Chester*, 891 F.2d 458, 467 (3d Cir. 1989).

[128] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

[129] *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984) (citing *Monell*, 436 U.S. at 690–91).

[130] *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quoting *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).

[131] *Kelly v. Borough of Carlisle*, 622 F.3d 248, 263 (3d Cir. 2010); *see also Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001).

[132] *Vuyanich v. South Huntingdon Township*, No. 19-1342, 2023 WL 4238891, at *7 (W.D. Pa. June 28, 2023) (quotation marks and modifications omitted) (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir. 1991)).

[133] *Kelly*, 622 F.3d at 264.

[134] *Id.* at 263.

23

though [it] has not received formal approval through the body's official decisionmaking channels,"[135] but it "must have the force of law by virtue of the persistent practices of [municipal] officials."[136]

Defendants contend that, while Plaintiffs have "properly named" the Township as a defendant, the BOC and Fire Board are improperly named because they do not have "a legal existence separate and apart from the Township . . . ."[137] Plaintiffs respond that the BOC and Fire Board are being sued as separate governmental entities—as opposed to claims brought against individual Board members—and that those entities "acted independently of each other . . . ."[138] The Court agrees that the BOC and Fire Board should be dismissed, but for different reasons.

The Court first addresses the BOC. Because Cheltenham Township is a home rule township,[139] the Pennsylvania Constitution grants it "all powers 'not denied by [the] Constitution, by its home rule charter or by the General Assembly at any time.'"[140] Therefore, the Township "is authorized to exercise 'any power that the General Assembly did not forbid,'

---

[135] *Monell*, 436 U.S. at 690–91.

[136] *Brown*, 269 F.3d at 215 (quotation marks and citation omitted).

[137] Defs.' Mot. Dismiss at 12 [Doc. No. 11].

[138] *See* Pls.' Resp. Opp'n Mot. Dismiss at 18–19 [Doc. No. 13].

[139] Cheltenham Township was previously organized in 1900 as a first class township under the Pennsylvania First Class Township Code. *Smith v. Cheltenham Township*, 35 Pa. Super. 507, 508 (1908); *see also* Compl. ¶¶ 16, 18 [Doc. No. 1]; 53 Pa. Cons. Stat. §§ 55101–58502. On January 1, 1977, Cheltenham "changed its form of government from that of a statutory township of the first class to a township under Home Rule Charter." *Meitner v. Cheltenham Township*, 460 A.2d 1235, 1237 (Pa. Commw. Ct. 1983). As the Pennsylvania Supreme Court has held, "the adoption of a home rule charter acts to remove a municipality from the operation of the code provisions enumerating the powers of that particular class of municipality." *Delaware County v. Middletown Township*, 511 A.2d 811, 813 (Pa. 1986); *see also Pa. Rest. and Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 824 (Pa. 2019) [hereinafter *PRLA*].

[140] *PRLA*, 211 A.3d at 824 (quoting Pa. Const. art. IX, § 2).

and it does not require an 'express statutory warrant for each new ordinance' that it passes."[141] All of the Township's governmental power is vested in the BOC under the Township's Home Rule Charter.[142] In other words, the BOC has final policymaking authority on behalf of the Township (barring legislative or constitutional restrictions not relevant here).

The thrust of Plaintiff's allegations is that the Township and the BOC caused constitutional harms through official actions—namely, by voting to decertify Ogontz Fire during the December 16, 2020 meeting,[143] and by adopting an Ordinance confirming the decertification.[144] Such official actions fall comfortably within the first track of § 1983 liability available under *Monell*.[145] However, it does not follow that the Township and BOC each must be named as parties in the litigation. Under *Monell* and its progeny, district courts have discretion to dismiss official capacity claims against municipal officers or sub-entities when those claims are redundant of the claims being brought directly against a municipality.[146] Although Third Circuit

---

[141] *Siger v. City of Chester*, No. 12 MAP 2023, No. 15 MAP 2023, 2024 WL 316333, at *14 (Pa. Jan. 29, 2024) (quoting *PRLA*, 211 A.3d at 816; *City of Phila. v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004)).

[142] Compl. ¶ 20 [Doc. No. 1].

[143] *Id.* ¶ 122.

[144] *Id.* ¶ 190; *see also* Defs.' Mot. Dismiss, Ex. G [Doc. No. 11-1] (Cheltenham Twp., Pa., Ordinance No. 2423-21 (2021)); Defs.' Mot. Dismiss, Ex. F at 3–5 [Doc. No. 11-1] (minutes of March 17, 2021 BOC meeting).

[145] To the extent that Plaintiffs also allege constitutional harms arising from a "custom" under the first track of *Monell* liability, or from a failure or inadequacy "reflect[ing] a deliberate or conscious choice" under the second track, the Court will defer ruling on those theories of liability until further discovery has been conducted.

[146] *See Schor v. N. Braddock Borough*, 801 F. Supp. 2d 369, 376–77 (W.D. Pa. 2011) (collecting cases and dismissing Board of Supervisors and borough officials in § 1983 litigation where borough was sued directly). Plaintiffs cite a decision from this Court which permitted § 1983 claims to proceed against the Montgomery County Board of Commissioners. Pls.' Resp. Opp'n Mot. Dismiss at 18 [Doc. No. 13] (quoting *Zatuchni v. Richman*, No. 07-4600, 2008 WL 3408554, at *4 (E.D. Pa. Aug. 12, 2008)). However, the three members of the board were sued individually in that case, and most relevant here, the plaintiff did not name the county as a defendant. *Zatuchni*, 2008 WL 3408554 at *4.

precedent suggests the BOC *could* be named,[147] the Court, in its discretion, will dismiss without prejudice all claims against the BOC as redundant of the claims against the Township.

The Court next considers the Fire Board. Even assuming that the Fire Board is a suable entity, it is similarly subject to dismissal on redundancy grounds. The BOC has delegated certain responsibilities to the Fire Board concerning the administration of firefighting services in the Township, but those powers are described primarily in terms of "making recommendations to the BOC" about the administration and management of the Fire Department.[148] The Township Code makes clear that the Fire Board's delegated authority—such as its ability to promulgate rules and regulations—is "subject to the approval of the Board of Commissioners . . . ."[149] Put simply, the Fire Board acted under the supervision of the BOC, and the BOC acted directly on behalf of the Township. Because the claims against the Fire Board are similarly redundant of the claims against the Township, all claims against the Fire Board will be dismissed without prejudice.

### C.  Failure to State a Substantive Claim under Federal Law

#### 1.  Count III: Fifth Amendment Taking

The Takings Clause of the Fifth Amendment prohibits the taking of private property "for public use, without just compensation,"[150] meaning "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it."[151] The

---

[147] *Cf. Brown*, 269 F.3d at 215 ("[A] body [such as Muhlenberg Township or its Board of Supervisors] may . . . be sued directly if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." (emphasis added) (modification in original) (quotation marks and citations omitted)).

[148] Compl. ¶ 26 [Doc. No. 1]; *see also* Cheltenham Twp., Pa., Code §§ 22-3, 22-4 (2021).

[149] *Id.* § 22-4(B).

[150] U.S. Const. amend. V.

[151] *Knick v. Township of Scott*, 588 U.S. 180, 139 S. Ct. 2162, 2167 (2019).

Takings Clause applies against states and local governments through the Fourteenth Amendment.[152] Property owners are protected against physical takings—a direct appropriation of personal or real property—but they may also allege a regulatory taking, where a government restriction on the use of property goes "too far." [153]

"There are two types of regulatory takings: (1) takings *per se* or total takings, where the regulation denies all economically beneficial productive use of the property . . .; and (2) partial takings that, though not rendering the property idle, require compensation under the test set forth in *Penn Central Transportation Co. v. City of New York* . . . ."[154] Determining whether a government action constitutes a regulatory taking is not a "set formula," but rather involves "essentially ad hoc, factual inquiries."[155] The relevant considerations for a partial taking under the *Penn Central* factors are: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) the character of the governmental action.[156]

First, the Court identifies the relevant property interests and whether they are protected. Although the Takings Clause protects against intrusions upon both personal and real property, the Court declines to recognize a protected property interest in Ogontz Fire's ability to fight

---

[152] *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980) (citing *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239 (1897); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 122 (1978)).

[153] *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (quotation marks omitted) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

[154] *Nekrilov v. City of New Jersey*, 45 F.4th 662, 669 (3d Cir. 2022) (citations omitted) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992); *Penn Cent.*, 438 U.S. 104).

[155] *Lucas*, 505 U.S. at 1015 (quotation marks omitted) (quoting *Penn Cent.*, 438 U.S. at 124).

[156] *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996) (quotation marks omitted) (quoting *Penn Cent.*, 438 U.S. at 124); *Nekrilov*, 45 F.4th at 672.

fires.[157] The provision of fire services is a traditional public function in Pennsylvania.[158] The

Third Circuit has recognized "that volunteer fire companies are engaged in a public function and

. . . municipalities have a public duty to provide fire protection."[159] Illustrative here, in

considering a case where a volunteer fire company "operated with much autonomy," "had its

own by-laws, its own constitution, and the authority to adopt policies and regulations," the Third

Circuit nevertheless held that the volunteer fire company was a "state actor" for purposes of

§ 1983 liability.[160] Although "the history, structure, organization and public duty of volunteer

fire companies distinguish them from any other organization in existence in this Commonwealth

today,"[161] the reality is that volunteer fire companies and the core public services they provide

are frequently and necessarily interwoven with state oversight and funding.[162]

Thus, it is apparent (as a general matter) that the Township's Board of Commissioners

operated within the bounds of its state-delegated authority by involving itself, through formal

action, in Ogontz Fire's firefighting operations.[163] To state a takings claim, Ogontz Fire cannot

plead merely that the Township's conduct interfered with Ogontz Fire's ability to fight fires. It

---

[157] *See Nekrilov*, 45 F.4th at 670 (finding no "general right to do business as a property interest cognizable under the Takings Clause").

[158] *See Mark v. Borough of Hatboro*, 51 F.3d 1137, 1145 (3d Cir. 1995).

[159] *Id.*; *Commonwealth ex rel. Firemen's Relief Ass'n v. Barker*, 61 A. 253, 254 (Pa. 1905) ("The protection of the city from fire is a municipal function of the highest importance[.]"); *see also Harmony Volunteer Fire Co. and Relief Ass'n v. Commonwealth*, 459 A.2d 439, 443 (Pa. Commw. Ct. 1983) ("Fire protection is a function public or governmental in nature . . . which would have to be performed by the Government but for the activities of volunteer fire departments." (quoting *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 24 (2d Cir. 1979))).

[160] *Mark*, 51 F.3d at 1148.

[161] *Temple v. Milmont Fire Co.*, 525 A.2d 848, 851 (Pa. Commw. Ct. 1987), *appeal denied*, 533 A.2d 95 (Pa. 1987).

[162] *Mark*, 51 F.3d at 1148.

[163] *See Zern v. Muldoon*, 516 A.2d 799, 805 (Pa. Commw. Ct. 1986), *appeal dismissed*, 541 A.2d 314 (Pa. 1988) ("The extensive statutory legislation which enhances and directs the organization of volunteer fire companies demonstrates an adoption by the Commonwealth and its citizenry of the governmental characteristic of volunteer fire companies.").

must plead that the Township's conduct effected a taking on a protected property interest.

Ogontz Fire has done so. Its other identified holdings are well within the core category of

property interests the Takings Clause protects. The Township does not contest that Ogontz Fire

owns its firehouse in perpetuity (after monthly payments totaling nearly a million dollars), nor

does the Township contest that Plaintiffs have a right to use the property on which the firehouse

is built for nearly another fifty years, pursuant to the 1974 Indenture. The Complaint alleges that

Ogontz Fire also owns cash reserves and equipment.[164] All of these fundamental property

interests are sufficient to support a takings claim.[165]

Second, the Court considers the finality requirement established by the Supreme Court.

Plaintiffs bringing a regulatory takings claim must meet their burden to establish that a takings

claim is ripe for decision under Article III. "[A] federal court should not consider [a regulatory

takings] claim before the government has reached a 'final' decision,"[166] specifically "regarding

the application of the [challenged] regulations to the property at issue" from "the government

entity charged with implementing the regulations . . . ."[167] The Supreme Court has held that the

finality requirement no longer includes a state-litigation component, as was previously

---

[164] Compl. ¶¶ 191, 203 [Doc. No. 1].

[165] Indeed, in a case where a volunteer fire company was no longer permitted to fight fires in a municipality and its charitable purpose thereby became "impractical," the Pennsylvania Commonwealth Court nevertheless held that the Commonwealth lacked the authority to redistribute the fire company's assets without an order of involuntary dissolution under the Pennsylvania Nonprofit Corporation Law of 1988. *In re Indep. Fire Co. No. 1*, No. 1489 C.D. 2018, 2020 WL 563505, at *1 (Pa. Commw. Ct. Feb. 5, 2020). Although that case analyzed the *cy pres* doctrine (as codified in the Uniform Trust Act) rather than the Takings Clause, the decision highlights that volunteer fire companies have property interests even if their ability to fulfill their essential firefighting mission has been frustrated. *See also In re Lincoln Fire Co.*, No. 479 C.D. 2022, 2024 WL 158111 (Pa. Commw. Ct. Jan. 16, 2024).

[166] *Pakdel v. City and County of San Francisco*, 594 U.S. 474, 475 (2021) (citing *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 737 (1997)).

[167] *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled by Knick*, 588 U.S. 180.

mandatory under *Williamson County*.[168] Instead, as presently formulated, "[t]he finality requirement is relatively modest" and requires a plaintiff only to show "that there is no question about how the regulations at issue apply to the particular land in question."[169]

Based on the allegations set forth in the Complaint, the finality requirement is satisfied. The regulatory actions being challenged were specific to Ogontz Fire and its operations. The Complaint states that months after the BOC adopted Ordinance No. 2423-21, "Defendants threatened Ogontz Fire and its members with 'a list of the issues with the former Ogontz Fire Company Firehouse,' . . . demanded from Ogontz Fire 'a proposal . . . of its terms for turning over the Firehouse building to the Township by agreement'" and requested "'a date and time for an inspection of the former Ogontz Fire Company Firehouse.'"[170] Ogontz Fire contends that, in December 2022, the Township and its agents reaffirmed "that they are continuing to act to . . . take the Ogontz Property, . . . fire house, . . . monetary funds and equipment, and to cause the 'full dissolution' of Ogontz Fire."[171] The typical processes for satisfying finality—such as requesting an exemption to a regulation of general applicability— are inapposite where, as here, a regulation is directed at a particular owner and there are no established avenues for the government to clarify or change its decision. These facts, as pleaded, are a sufficient indication that the BOC "ma[de] up its mind" about what the Ordinance meant.[172]

---

[168] *See Knick*, 588 U.S. 180.

[169] *Pakdel*, 594 U.S. at 478 (cleaned up) (quoting *Suitum*, 520 U.S. at 739).

[170] Compl. ¶ 194 [Doc. No. 1].

[171] *Id.* ¶ 203; *see also id.* ¶ 40.

[172] *Pakdel*, 594 U.S. at 475.

Turning next to the merits analysis, Ogontz Fire does not allege a physical taking or direct appropriation of Ogontz Fire's property. Therefore, the Court applies the framework of analysis for regulatory takings. Additionally, Ogontz Fire does not appear to allege that the Township's conduct constituted a *per se* taking, so the Court considers the *Penn Central* factors under a partial taking theory of liability.

The first *Penn Central* factor, the economic impact of the regulation on the claimant, is difficult to apply in a case like this one. The frustration of a non-profit volunteer fire company's essentially charitable mission cannot easily be quantified in economic terms. That said, the Supreme Court has explained that even for profit-driven enterprises, the "loss of future profits— unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claims," because "[p]rediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform."[173] At this stage, Ogontz Fire does not rely upon speculative economic projections, but rather alleges that the decertification "has left Plaintiffs without reasonable commercial value or use of their property."[174] That is, in the Court's view, a facially plausible allegation given that the firehouse is exclusively designed to facilitate the provision of firefighting services—setting aside the important and unresolved question of whether and how the building could be repurposed or sold given that Ogontz Fire does not own the underlying land. The first factor weighs slightly in favor of Ogontz Fire's partial regulatory taking claim.

---

[173] *Andrus v. Allard*, 444 U.S. 51, 66 (1979).

[174] Compl. ¶ 259 [Doc. No. 1]; *see also id.* ¶ 242 ("[S]uch abusive regulation is intended to prevent any future use of the Ogontz Property, Ogontz fire house and funds and equipment[.]").

The second *Penn Central* factor, interference with investment-backed expectations, weighs strongly in Ogontz Fire's favor. The Complaint sufficiently alleges that, over 20 years, Ogontz Fire made payments to the Township totaling $960,986.50—roughly half of which was made up of accumulated interest—to purchase the firehouse.[175] The Township cites the Third Circuit's decision in *Nekrilov* to suggest that Ogontz Fire's expectations of the use of the firehouse were unreasonable because "plaintiffs do not have a protected property interest in continuing to act as a volunteer fire company for the Township."[176] It is true that, under *Nekrilov*, "distinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest."[177] The Takings Clause also does not guarantee that "once a property has been devoted to a particular use, the owner has a reasonable expectation of being able to continue with that use absent the payment of compensation."[178] However, Ogontz Fire does not base its takings claim solely on its expectation that it could continue to use its property to fight fires. Taking the facts alleged in the Complaint as true, Ogontz Fire faces more robust restrictions to its ability to use its firehouse and land lease than merely a prohibition of firefighting activities, given the BOC's request for a proposal to turn the property over.[179]

---

[175] *Id.* ¶¶ 55, 56.

[176] Defs.' Mot. Dismiss at 23 [Doc. No. 11] (citing *Nekrilov*, 45 F.4th at 670).

[177] *Nekrilov*, 45 F.4th at 674–75 (quotation marks and modification omitted) (quoting *Pace Res., Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1033 (3d Cir. 1987)).

[178] *Id.* at 675 (quotation marks omitted) (quoting *Pace Res., Inc.*, 808 F.2d at 1032).

[179] Discovery is needed to determine the extent to which the firehouse and land lease have been deprived of economically beneficial uses. Even assuming that Defendants do not intend to effect a complete seizure of Ogontz Fire's holdings—meaning Ogontz Fire could conceivably repurpose the firehouse and land for some other commercial purpose—questions remain about the extent to which Ogontz Fire could transfer or assign its rights under the Indenture, or whether zoning ordinances or other regulations would restrict alternative commercial activities. The Court reserves judgment on these issues pending further discovery.

The third *Penn Central* factor, the character of the governmental action, weighs slightly against Ogontz Fire's partial regulatory taking claim. The Supreme Court has held that courts generally should be hesitant to find a regulatory taking when "the interference [with property] arises from some public program adjusting the benefits and burdens of economic life to promote the common good."[180] As previously stated, the provision of firefighting services is a traditional public function in the Commonwealth of Pennsylvania.[181] The Township's state-delegated authority necessarily includes the power to regulate firefighting in the Township.[182] On the other hand, when a law is part of a public initiative to promote the common good—such as zoning laws—typically "the law in question applies generally to a broad class of properties . . . ."[183] Here, as pleaded, the Township's actions had a direct economic impact only on Ogontz Fire's property, not other property in the Township or elsewhere in the Commonwealth. On balance, because firefighting is an area of regulation precisely within the BOC's zone of authority in promoting the common good, the Court holds that the third factor weighs against a regulatory takings claim—but only slightly so, given the targeted nature of the governmental action here.

In summary, for purposes of ruling on the motion to dismiss, the first and second *Penn Central* factors weigh in Ogontz Fire's favor, and the third factor weighs only slightly against it. Therefore, Ogontz Fire's claim under the Takings Clause will not be dismissed.

---

[180] *Penn Cent.*, 438 U.S. at 124.

[181] *See Mark*, 51 F.3d at 1145.

[182] *Supra* notes 158–163 (citing cases).

[183] *Rogin v. Bensalem Township*, 616 F.2d 680, 690 (3d Cir. 1980) (citing *Penn Cent.*, 438 U.S. at 125).

2.   <u>Count VII: Contract Clause</u>

"The Contract Clause provides that no State shall pass any law 'impairing the Obligation of Contracts.'"[184] "The Clause is not, however, the Draconian provision that its words might seem to imply."[185] It "'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public,' even though contracts previously entered into may be affected."[186] "Thus, the Contract Clause 'does not trump the police power of a state to protect the general welfare of its citizens.'"[187]

Ogontz Fire contends that the Township violated the Contract Clause because the decertification impaired Ogontz Fire's rights under the 1974 Indenture and 1980 Lease-Purchase Agreement, as well as its relationships with "contractors, subcontractors, vendors, suppliers and providers."[188] Ogontz Fire also alleges interference with its ability to associate with LaMott Fire Company, Glenside Fire Company, the Ogontz Fire Captain who was denied an internal promotion to Interim Chief, and the unnamed Ogontz Fire Chief who joined in 2021.[189]

The Supreme Court has developed a two-part test for adjudicating Contract Clause claims.[190] "The threshold issue is whether the state law has 'operated as a substantial impairment

---

[184] *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016) [hereinafter *USW*] (quoting U.S. Const. art. I, § 10). The Contract Clause "applies equally to municipal ordinances." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 822 (7th Cir. 2019) (citing *St. Paul Gaslight Co. v. City of St. Paul*, 181 U.S. 142, 148 (1901)).

[185] *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978).

[186] *USW*, 842 F.3d at 210 (quoting *Spannaus*, 438 U.S. at 241).

[187] *Id.* (quoting *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006)).

[188] Compl. ¶ 323 [Doc. No. 1].

[189] *Id.* ¶¶ 324, 326–27.

[190] *Sveen v. Melin*, 584 U.S. 811, 819 (2018).

of a contractual relationship.'"[191] If it has, then courts ask "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"[192] To determine if state legislation operates as a substantial impairment, courts consider the "extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."[193] Of course, finding a substantial impairment of a contract requires that there be a contractual relationship. "[T]he Contract Clause only protects *existing* contractual relationships and legitimate expectations based on the law in effect *at the time of the contract* . . . ."[194]

Most of the Contract Clause violations alleged here must be dismissed because Ogontz Fire pleads no facts plausibly suggesting a contractual relationship. First, Ogontz Fire claims an infringement of its rights to work with its "contractors, subcontractors, vendors, suppliers, and providers."[195] Such parties are not described or even referenced anywhere else in the Complaint. Second, Ogontz Fire alleges an impairment of its association with LaMott Fire Company.[196] The Complaint states only that Ogontz Fire "continued to work with LaMott Fire Company" around the time the DCED Report was published in November 2020, but Ogontz Fire pleads no facts suggesting that a contractual relationship existed between Ogontz and LaMott (or any of LaMott's members, including the Deputy Chief whose transfer request was denied).[197] Third,

---

[191] *Id.* (quoting *Spannaus*, 438 U.S. at 244).

[192] *Id.* (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983)).

[193] *Id.* (citations omitted).

[194] *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 386 (3d Cir. 2012) (citing *Troy Ltd. v. Renna*, 727 F.2d 287, 296–99 (3d Cir. 1984)).

[195] Compl. ¶ 323 [Doc. No. 1].

[196] *Id.* ¶ 324.

[197] *See id.* ¶ 68.

Ogontz Fire alleges that the Township prevented a merger, substation, or association with Glenside Fire Company.[198] Ogontz Fire makes only vague references to its "attempts" to merge or associate with Glenside Fire—and, most important here, the Complaint states that the Township "prevented Ogontz from responding to emergency calls . . . as a substation of and/or merger or association with Glenside" only *after* the decertification.[199] Fourth, Ogontz Fire contends that the Township interfered with its relationships with the unnamed Ogontz Fire Captain (who was denied an internal promotion) and the unnamed Ogontz Fire Chief (who did not join Ogontz Fire until 2021). The Complaint does not describe any contractual relationship between Ogontz Fire and those unidentified members. All of these Contract Clause claims will be dismissed for failure to plead the existence of a contractual relationship.

The Court next considers Ogontz Fire's Contract Clause claims based on the 1974 Indenture and 1980 Lease-Purchase Agreement. In contrast to the other alleged contractual relationships discussed above, the Complaint pleads robust factual details supporting the existence of those agreements and the rights that Ogontz Fire holds under those agreements.[200] However, the Township raises the persuasive point that Ogontz Fire's contractual rights under the Lease-Purchase Agreement cannot provide a basis for a Contract Clause claim, because the acquisition of the firehouse has long been complete.[201] The Court agrees. Although Ogontz Fire

---

[198] *Id.* ¶ 326.

[199] *Id.* ¶¶ 80–81, 199–200. The only contractual relationship described in the Complaint between Ogontz Fire and any other fire company in the Township is the "Operational Unification of Station 3 & 5 Agreement," which the Complaint states was in effect between Ogontz Fire and Elkins Park Fire Company from 2014 to at least 2020. *Id.* ¶ 67. However, Ogontz Fire does not assert a Contract Clause claim based on that Agreement in its Complaint or briefings.

[200] *Id.* ¶¶ 35, 42–46, 49–60.

[201] Defs.' Mot. Dismiss at 29 [Doc. No. 11] ("[T]he complaint alleges that the acquisition of the firehouse was completed under its terms, and ownership was transferred to Ogontz. So, the purchase of the [firehouse] was not an existing contractual relationship.").

seeks relief for alleged restrictions on the use of its firehouse, its now-vested ownership of the firehouse dictates that such relief is properly pursued through its Takings Clause claim. The Contracts Clause claim premised on the terms in the Lease-Purchase Agreement relating to the purchase of the firehouse will be dismissed.

Finally, the 1974 Indenture, which the Complaint states was incorporated into the Lease-Purchase Agreement, is an existing contractual relationship.[202] Ogontz Fire must plead facts which, accepted as true, plausibly suggest that Ordinance No. 2423-21 interfered with Ogontz Fire's reasonable expectations under the Indenture. "An important factor in determining the substantiality of any contractual impairment is whether the parties were operating in a regulated industry."[203] "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable."[204]

Firefighting is a highly regulated industry in Cheltenham Township, as made clear by the numerous sections of the Township's Code dedicated to the organization and administration of firefighting services.[205] Therefore, as a general matter, it was highly foreseeable to Ogontz Fire that changes in the Township's firefighting regulations could impact Ogontz Fire's existing contractual relationships related to firefighting. Ogontz Fire could not have reasonably expected

---

[202] Compl. ¶ 376 [Doc. No. 1].

[203] *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012) (citing *Energy Rsrvs.*, 459 U.S. at 411).

[204] *Id.* (citation omitted).

[205] *See Zern*, 516 A.2d at 805 ("The extensive statutory legislation which enhances and directs the organization of volunteer fire companies demonstrates an adoption by the Commonwealth and its citizenry of the governmental characteristic of volunteer fire companies.").

the Indenture to convey an unfettered right to fight fires from the Ogontz Property.[206] However, it was well within reason for Ogontz Fire to have expected a right to enjoy other general uses of the land until the end of the 99-year period—*i.e.*, until at least 2073. As quoted in the Complaint, the Indenture states that Ogontz Fire, so long as it paid its nominal rent each year, "shall and may peaceably and quietly have, hold and enjoy the demised premises during the term aforesaid."[207] Ogontz Fire adequately pleads that its decertification, as interpreted by Defendants, was an actionable interference with those reasonable expectations.[208]

The next step is to determine whether Ordinance No. 2423-21 was drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.[209] "A legitimate public purpose is one aimed at remedying a broad and general social or economic problem; it need not be addressed to an emergency or temporary situation."[210] The public regulation of firefighting is a significant and legitimate public purpose.[211] The key remaining question, then, is whether the challenged regulation here was appropriate and reasonable. Where, as here, an arm of the government is a party to a contract, a contractual "impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at

---

[206] *See supra* sec. III.C.1 (explaining with respect to takings claim that the BOC's state-delegated authority necessarily includes the power to cease Ogontz Fire's firefighting operations); Compl. ¶ 54 [Doc. No. 1] ("There is no provision, in the Lease-Purchase Agreement, requiring the property to be used as a firehouse.").

[207] *Id.* ¶¶ 44–45.

[208] *Id.* ¶ 194 ("Defendants threatened Ogontz Fire and its members with 'a list of the issues with the former Ogontz Fire Company Firehouse,' . . . demanded from Ogontz Fire 'a proposal . . . of its terms for turning over the Firehouse building to the Township by agreement'" and requested "'a date and time for an inspection of the former Ogontz Fire Company Firehouse.'").

[209] *Sveen*, 584 U.S. at 819 (citation omitted).

[210] *USW*, 842 F.3d at 211 (citing *Energy Rsrvs.*, 459 U.S. at 411–12).

[211] *See supra* sec. III.C.1 (citing cases).

the time the contractual obligation was incurred."[212] The government must also use the least intrusive means to achieve its goals; it is not free to impose a "drastic impairment when an evident and more moderate course would serve its purposes equally well."[213] The Contract Clause does not, however, "'require the courts . . . to sit as superlegislatures,' choosing among various options proposed by plaintiffs, as [courts are] 'ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives.'"[214]

In the ordinary course, a court should be highly reluctant to impose its own viewpoints over those of better-informed, elected municipal officials, particularly when the governmental actions being challenged involve the provision of a quintessential public service. At this early stage of the litigation, however, a careful balance must be struck between upholding well-established principles of federalism and permitting Ogontz Fire to fairly litigate well-pleaded violations of its continuing real property interests. Without further development of the factual record, the Court cannot determine whether the problems the BOC sought to resolve through the decertification existed when the Indenture was executed in 1974 or reincorporated in 1980. Nor can the Court adequately weigh the interests and alternative options the BOC considered. Discovery is essential to clarify these issues. Accordingly, Ogontz Fire's Contract Clause claim arising from the 1974 Indenture and the provisions of the 1980 Lease-Purchase Agreement incorporating the Indenture will not be dismissed.

---

[212] *USW*, 842 F.3d at 212–14 (explaining that the legislature knew about the budget crisis when it agreed to provide a salary increase to government employees); *see also U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 30–32 (1977).

[213] *Id.* at 212 (citation omitted).

[214] *Id.* at 213 (quoting *Balt. Tchrs. Union v. Mayor of Balt.*, 6 F.3d 1012, 1021–22 (4th Cir. 1993)); *see also ACRA Turf Club, LLC v. Zanzuccki*, 724 F. App'x 102, 108 (3d Cir. 2018). It is not the Court's role to strike down legislation merely because certain parties dislike the results of the legislation. *See id.*

3.   Counts V–VI: First Amendment[215]

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[216] The protections of the First Amendment are incorporated against the states through the Due Process Clause of the Fourteenth Amendment.[217] Plaintiffs bring two First Amendment claims. First, they allege that Defendants violated their right to associate. Second, they allege that Defendants retaliated against Plaintiffs for engaging in protected speech. The Court considers each claim in turn.

a.   *Association*

The right to freedom of association under the First Amendment "secures 'a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'"[218] The Supreme Court has established a three-step process to analyze expressive associational claims. A plaintiff must show: (1) that "the group making the claim engaged in expressive association"; (2) that "the state action at issue significantly affected the group's ability to advocate its

---

[215] The Court notes here the difference in standards for establishing Article III standing versus adequately pleading a claim. Although the Court has determined that Plaintiffs Gordon and Ogontz Fire have standing to bring their First Amendment claims, it does not necessarily follow that they have met their burden to survive a motion to dismiss under Rule 12(b)(6). *See Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 733 (3d Cir. 1970) ("[W]e must not confuse requirements necessary to state a cause of action . . . with the prerequisites of standing.").

[216] U.S. Const. amend. I.

[217] *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937); *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

[218] *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 431 (3d Cir. 2020) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984)).

viewpoints"; and (3) that "the state's interest implicated in its action" justified the "burden imposed on the associational expression . . . ."[219]

There is no set formula for determining whether a group is one that engages in expressive association. To be sure, "[t]he First Amendment's protection of expressive association is not reserved for advocacy groups,"[220] and "there is no requirement that an organization be primarily political (or even primarily expressive) in order to receive constitutional protection for expressive associational activity."[221] However, "to come within [the First Amendment's] ambit, a group must engage in some form of expression, whether it be public or private."[222] "[A]n organization must do more than simply claim to be an expressive association in order to receive the benefits of constitutional protection."[223]

Plaintiffs fail to allege facts supporting their contention that Ogontz Fire is an expressive association. The Complaint states that Ogontz Fire's object and purpose include "promot[ing] the exchange of ideas among those interested in firefighting and fire prevention in the community" and "bring[ing] to the attention of citizens of Cheltenham Township the vital importance of avoiding fire . . . ."[224] Plaintiffs allege that Defendants violated their right of expressive association by preventing Ogontz Fire and its members from associating with or transferring to other fire companies in the Township.[225] The Complaint does not, however, plead any facts

---

[219] *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000) (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)).

[220] *Dale*, 530 U.S. at 648.

[221] *Pi Lambda Phi*, 229 F.3d at 443.

[222] *Dale*, 530 U.S. at 648.

[223] *Pi Lambda Phi*, 229 F.3d at 444.

[224] Compl. ¶ 34 [Doc. No. 1].

[225] Pls.' Resp. Opp'n Mot. Dismiss at 35–36 [Doc. No. 13].

supporting the notion that Ogontz Fire regularly exchanges ideas about firefighting and fire prevention in its community. Although "[t]he Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity,"[226] ranging from "tak[ing] public positions on a number of diverse issues" to "regularly engag[ing] in a variety of civic, charitable, lobbying, fundraising, and other activities,"[227] nothing in the Complaint suggests that Ogontz Fire has engaged in anything of the sort. For that reason alone, Ogontz Fire's claim of infringement of its right to expressive association is subject to dismissal.

Even if the Complaint did plead facts suggesting that Ogontz Fire is an expressive association, its associational claim would still fail because Plaintiffs have not sufficiently pleaded an infringement of their expressive rights. Setting aside the effect of Defendants' official conduct on Ogontz Fire's property interests, the decertification of Ogontz Fire does not prevent its members from *generally* associating or from promoting the exchange of ideas with each other or in their community. Rather, Ogontz Fire and its members are no longer authorized to *fight fires* in the Township—a category of activity even Plaintiffs do not contend is expressive.

Plaintiffs' allegation that Defendants "prevented Ogontz Fire and its members from associating with other fire companies" is unavailing.[228] Plaintiffs place a particular emphasis on Defendants' alleged interference with Ogontz Fire's attempts to merge or substation with Glenside Fire Company.[229] The Complaint also refers to Defendants' alleged interference with the attempts of LaMott Fire's members (and others) to transfer to Ogontz Fire, as well as the

---

[226] *Pi Lambda Phi*, 229 F.3d at 443.

[227] *Roberts*, 468 U.S. at 626–27.

[228] Compl. ¶ 285 [Doc. No. 1].

[229] *Id.* ¶¶ 288–89.

attempts of Ogontz Fire's members to transfer outward to other fire companies.[230] However, the denial of transfer requests among fire companies is different in kind from the "forced inclusion" of an assistant scoutmaster among the ranks of the Boy Scouts, which the Supreme Court held would "force the organization to send a message" inconsistent with its sincerely held values.[231] Finally, the Complaint also states that Ogontz Fire successfully "recruited additional members to increase their volunteer firefighter membership" before the March 2021 BOC meeting, contradicting Plaintiffs' contention that Ogontz Fire could not associate with and recruit new members as a result of the transfer and merger decisions.[232]

This case is comparable to the Third Circuit's decision in *Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh*, which affirmed that there is no infringement of First Amendment expressive rights when the government "acts out of non-ideological motives to directly restrict a group's non-expressive activity, even when those actions would have an indirect effect on expressive activity."[233] In that case, the Third Court determined that a fraternity chapter at the University of Pittsburgh had not established that it was an expressive association, given "its meager showing of a few minor acts of community service" without any indication that the group took positions on public questions or other similar expressive activities previously identified by the Supreme Court.[234] Plaintiffs have failed to meet their burden in pleading their First Amendment associational claims and those claims will be dismissed.

---

[230] *Id.* ¶¶ 284, 286.

[231] *Compare Dale*, 530 U.S. at 651, 653 *with* Compl. ¶ 289 [Doc. No. 1] (describing the Township's conduct as having "prevented Ogontz Fire from *responding to emergency calls*" through an affiliation with Glenside Fire Company (emphasis added)).

[232] Compl. ¶ 188 [Doc. No. 1].

[233] *Pi Lambda Phi*, 229 F.3d at 445 (citing *Healy v. James*, 408 U.S. 169 (1972)).

[234] *Pi Lambda Phi*, 229 F.3d at 444.

b. *Retaliation*

The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in constitutionally protected speech.[235] "Official retaliation for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'"[236] A plaintiff bringing a First Amendment retaliation claim must allege "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."[237]

Plaintiffs allege that Defendants decertified Ogontz Fire in retaliation for Ogontz Fire's decision to suspend rather than terminate the Lieutenant who had an altercation with a Township resident.[238] Plaintiffs characterize Ogontz Fire's decision to impose a lesser punishment on the Lieutenant as an exercise of their protected right to say "no."[239] Defendants respond—and Plaintiffs do not contest—that Ogontz Fire's refusal to terminate the Lieutenant was made in its capacity as a government employee or contractor.[240] The Supreme Court has long imposed an additional "public concern" threshold for First Amendment retaliation claims brought by

---

[235] *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out . . . ." (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972))).

[236] *Starnes*, 971 F.3d at 429 (quoting *Hartman*, 547 U.S. at 256).

[237] *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017) (quotation marks omitted) (quoting *Thomas v. Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006)).

[238] Compl. ¶¶ 295–305, 86–88 [Doc. No. 1].

[239] *Id.* ¶¶ 303–04.

[240] Defs.' Mot. Dismiss at 28 [Doc. No. 11] ("[A] refusal of discipline for a firefighter in the Township Fire Department was clearly a statement within Ogontz's capacity as a member of the fire department . . . ."); Pl.'s Resp. Opp'n Mot. Dismiss at 37 [Doc. No. 13] (applying "public concern" test).

government employees.[241] "A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made."[242] "A public employee does not speak 'as a citizen' when he makes a statement 'pursuant to his official duties.'"[243]

The Court agrees that Ogontz Fire cannot be said to have spoken as a citizen here. Indeed, the Third Circuit has held that volunteer fire companies, even those which "operate[ ] with much autonomy," may be "state actors" for purposes of § 1983 liability.[244] That is because "volunteer fire companies are engaged in a public function"[245]—that is, "[t]he protection of the city from fire," which "is a municipal function of the highest importance . . . ."[246] Put simply, a non-profit entity performing a public service on behalf of a municipality is acting pursuant to its official duties when it chooses how to discipline one of its members for a disciplinary infraction related to the provision of that public service.[247] The Court need not engage in a further analysis

---

[241] *See Connick v. Myers*, 461 U.S. 138 (1983).

[242] *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

[243] *Borough of Kutztown*, 455 F.3d at 242 (modification omitted) (quoting *Garcetti*, 547 U.S. at 421).

[244] *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1147 (3d Cir. 1995).

[245] *Id.* at 1145.

[246] *Commonwealth ex rel. Firemen's Relief Ass'n v. Barker*, 61 A. 253, 254 (Pa. 1905).

[247] Plaintiffs cite a recent decision from the Western District of Pennsylvania for the proposition that retaliation claims may survive a motion to dismiss when volunteer firefighters "voic[e] concerns related to internal discipline and operational matters . . . ." Pls.' Resp. Opp'n Mot. Dismiss at 38 [Doc. No. 13] (citing *Blessing v. City of Latrobe*, No. 20-1212, 2022 WL 114077 (W.D. Pa. Jan. 12, 2022)). That case, however, involved public protests of alleged misconduct and election interference by the city's elected Fire Chief. *Id.* at *1–2, *5. Those facts are clearly distinguishable from this case, which involved a purely internal disciplinary decision regarding an undisputed infraction by an unelected volunteer.

of the remaining elements. Plaintiffs' First Amendment retaliation claim will be dismissed. Moreover, because the Court has held that Plaintiff Arthur Gordon has Article III standing only to bring claims under the First Amendment based on his own constitutional interests, Gordon will be dismissed as a party to this litigation.

       4.   Count I: Equal Protection

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws."[248] It is "essentially a direction that all persons similarly situated should be treated alike."[249] In reviewing a § 1983 claim under the Equal Protection Clause, courts must first determine "whether the alleged state action burdens a fundamental constitutional right or targets a suspect class."[250] If not, the state action "does not violate equal protection so long as it bears a rational relationship to some legitimate end."[251]

The Complaint does not allege that Ogontz Fire or its members are part of a protected class. It states only that Ogontz Fire as an entity was treated differently from other fire companies in the Township, despite being similarly situated to those other fire companies.[252] In response to Defendants' motion to dismiss, Plaintiffs belatedly raise the argument that their equal protection claim "is at least in part premised on Defendants' discrimination against Ogontz Fire

---

[248] U.S. Const. amend. XIV, § 1.

[249] *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

[250] *State Troopers Non-Comm'd Officers Ass'n v. New Jersey*, 399 F. App'x 752, 754 (3d Cir. 2010) (citing *Doe v. Pa. Bd. of Prob. and Parole*, 513 F.3d 95, 107 (3d Cir. 2008)).

[251] *Doe*, 513 F.3d at 107 (citing *Romer v. Evans*, 517 U.S. 620, 631 (1996)).

[252] *See, e.g.*, Compl. ¶ 206 [Doc. No. 1] ("There is no meaningful difference between Plaintiff Ogontz Fire and the four . . . other privately formed volunteer fire fighting companies . . . ."); *id.* ¶ 209 ("Defendants . . . treated Ogontz Fire differently from the other four . . . similarly situated fire companies . . . and there is no rational basis for the difference in treatment.").

and its members based on race . . . ."[253] However, as discussed previously with respect to standing, the Complaint is devoid of alleged facts suggesting any kind of discrimination against Ogontz Fire's individual members, as opposed to purported discrimination against other parties.

Again, Ogontz Fire does not (and cannot) assert the rights of the Black LaMott Deputy Chief whose transfer request was denied. The same is true for hypothetical claims by other minority transfer candidates. Even drawing all inferences in favor of Plaintiffs and applying a generous view of their indirect theory of harm, it appears doubtful that Plaintiffs meet the threshold for pleading a claim of racial discrimination.[254] That said, the Court need not decide the issue because it has already determined that Plaintiff Gordon has failed to establish Article III standing to bring an equal protection claim, and Ogontz Fire likewise cannot rely on representational standing to bring such a claim on behalf of its absent members.[255] The Court addresses here only the Equal Protection claim arising from the allegedly disparate treatment of Ogontz Fire as an entity, as compared to the other fire companies in the Township.

Because Ogontz Fire does not assert membership of a protected class, it must proceed under an equal protection "class of one" theory.[256] To survive a motion to dismiss, a plaintiff relying on the "class of one" theory "must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no

---

[253] Pls.' Resp. Opp'n Mot. Dismiss at 29 [Doc. No. 13].

[254] Plaintiffs present a more indirect theory of harm in that the Township's conduct denied Ogontz Fire a more diverse body of firefighters. In addition to highlighting the Black LaMott Deputy Chief's transfer denial, Plaintiffs also vaguely suggest, with no supporting factual allegations, that other Black members of LaMott Fire Company would have followed their Deputy Chief to Ogontz Fire if his request had been granted. *Id.* at 14.

[255] *Supra* sec. III.A.2.

[256] *Borough of Kutztown*, 455 F.3d at 239.

rational basis for the difference in treatment."[257] An ordinance or official proclamation adopted by a municipality is constitutional under rational basis review "if there is 'any reasonably conceivable set of facts that could provide a rational basis for' it."[258] While the test is a low threshold, the Supreme Court has clarified that courts must always identify "the relation between the classification adopted and the object to be obtained" even when deciding on "the ordinary equal protection case calling for the most deferential standards . . . ."[259]

Ogontz Fire has failed to sufficiently allege that the Township and the BOC's conduct had no rational basis. Ogontz Fire can only state an Equal Protection claim by alleging that there is no reasonably conceivable set of facts which could provide a rational basis for the BOC's exercise of its authority. The Complaint fails to meet that burden.

The meeting minutes from the BOC meeting on December 16, 2020 reflect extensive discussion about Ogontz Fire's deficiencies as a provider of firefighting services.[260] Fire Marshal Scott Lynch stated in his presentation to the Board that Ogontz Fire was suffering from "diminishing of responses to calls," and in response to a Commissioner's question, he confirmed that there was "potential liability associated with" Ogontz Fire's staffing issues.[261] Commissioner Zygmund-Felt represented that, based on his observations during Fire Board meetings over two and a half years, this was "not a new issue" and "ha[d] been raised consistently" without an adequate response from Ogontz Fire's leadership.[262] Likewise, during

---

[257] *Id.* (citing *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam)).

[258] *Doe*, 513 F.3d at 107 (quoting *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993)).

[259] *Doe*, 513 F.3d at 107–08 (quotation marks omitted) (quoting *Romer*, 517 U.S. at 632).

[260] *See generally* Defs.' Mot. Dismiss, Ex. B at 8–9 [Doc. No. 11-1] (December 16, 2020 meeting minutes).

[261] *Id.* at 8.

[262] *Id.* at 9.

the BOC's meeting on March 17, 2021, Township Solicitor Joseph Bagley cited testimony from the state preliminary injunction hearing "that the manpower situation has been years in the making," "[m]anpower at Ogontz began to trail off about 10 years ago," and "Ogontz's manpower issues were so acute that on occasions [Ogontz Fire] was called upon by the Montgomery County Department of Public Safety to dispatch <u>two</u> fire trucks and Ogontz was only able to man <u>one</u> truck."[263]

A rational basis standard does not demand that the Court second-guess whether the BOC made the best possible decision.[264] Even under the allegations of the Complaint, there was a rational basis for the BOC's decision to decertify Ogontz Fire based on the balancing of public interests. All claims by Ogontz Fire under the Equal Protection Clause will be dismissed.

### 5.  Counts II, IV: Due Process

In a section 1983 action, a party may raise three categories of due process claims under the Fourteenth Amendment: (1) claims incorporating "specific protections defined in the Bill of Rights"; (2) substantive due process claims "bar[ring] certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them"; and (3) procedural due process claims concerning the absence of procedural remedies where an individual is "depriv[ed] by state action of a constitutionally protected interest in life, liberty, or property."[265]

---

[263] Defs.' Mot. Dismiss, Ex. F at 4 [Doc. No. 11-1] (March 17, 2021 meeting minutes) (emphasis in original).

[264] *See Myrie v. Comm'r, N.J. Dep't of Corr.*, 267 F.3d 251, 263 (3d Cir. 2001) (explaining, in the due process context, that courts are not authorized "to exercise oversight with respect to the comparative efficiency, and/or relative wisdom, of the particular measure or measures that a legislature selects from a menu of possible measures reasonably calculated to achieve a permissible legislative objective."); *Heffner v. Murphy*, 745 F.3d 56, 81 (3d Cir. 2014) ("An otherwise rational legislative response to a given concern cannot be invalidated under the Due Process Clause merely because the chosen solution creates other problems while addressing the original concern.").

[265] *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quotation marks and citations omitted).

a. *Substantive Due Process*

As a threshold matter, the Court notes that Ogontz Fire's substantive due process claim arises from the same set of alleged facts as its Takings Clause claim. The Third Circuit has not determined whether substantive due process claims involving an intrusion on real property interests are subsumed by simultaneous claims brought under the Takings Clause of the Fifth Amendment.[266] Erring on the side of caution, the Court will consider the substantive due process claim separately, given the differences in the controlling standards for each type of claim and in accordance with the general rule that a court may find an interference with individual property rights to breach more than one provision of the Constitution.[267]

The Supreme Court has explained that "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."[268] "For protection against abuses by legislatures the people must resort to the polls, not to the courts."[269] Therefore, "[t]he Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly 'harsh and oppressive.'"[270] For challenges to legislative actions, "[g]enerally speaking, state laws need only be rational and non-arbitrary in order to satisfy the right to

---

[266] *Cf. Rocky Mountain Materials and Asphalt, Inc. v. Bd. of Cnty. Comm'rs of El Paso Cnty.*, 972 F.2d 309, 311 (10th Cir. 1992); *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 960 (9th Cir. 2011).

[267] *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49–50 (1993).

[268] *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488 (1955) (citations omitted).

[269] *Id.* at 464–65 (citation omitted).

[270] *U.S. Tr.,* 431 U.S. at 17 n.13 (quoting *Welch v. Henry*, 305 U.S. 134, 147 (1938)).

substantive due process."[271] "In general, this Circuit applies the standard of review for legislative acts when reviewing township ordinances."[272]

The BOC's adoption of Ordinance No. 2423-21 on March 17, 2021 was facially a legislative action. The Court is unaware of any precedent identifying a fundamental right to fight fires as a volunteer for a particular non-profit fire company, nor does Ogontz Fire cite such a case.[273] Because this action was rational and non-arbitrary (as discussed above) it cannot constitute a substantive due process violation. However, Ogontz Fire now disclaims any substantive due process theory of liability arising from the March 17, 2021 vote.[274] It instead contends that the BOC's initial decertification vote on December 16, 2020 violated Ogontz Fire's substantive due process rights.[275] The parties contest whether the BOC's December vote was a legislative act. That distinction matters because the standard differs for non-legislative acts: Plaintiffs bringing a substantive due process claim based on non-legislative conduct "must show

---

[271] *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 614 (7th Cir. 2014) (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)); *see also E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality opinion); *E. Enters.*, 524 U.S. at 550 (Kennedy, J., concurring in part) ("Statutes may be invalidated on due process grounds only under the most egregious of circumstances."); *United States v. Carlton*, 512 U.S. 26, 30 (1994); *Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006); *U.S. Steel Corp. v. Oravetz*, 686 F.2d 197, 201 (3d Cir. 1982).

[272] *Sassamansville Fire Co. No. 1 v. Livelsberger*, No. 21-4648, 2022 WL 889159, at *5 (E.D. Pa. Mar. 25, 2022).

[273] *Id.* at *6 ("The rights to be employed as a township-recognized fire company and to receive government-funded benefits are not fundamental rights protected by substantive due process."); *see also Versage v. Township of Clinton*, 984 F.2d 1359, 1370 (3d Cir. 1993) (finding no due process protections for property interest in benefits received as a volunteer firefighter); *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 138 (3d Cir. 2000) (holding that professor's "property interest in his tenured professorship" at state university was not "entitled to substantive due process protection"); *Reich v. Beharry*, 883 F.2d 239, 245 (3d Cir. 1989) (holding that service contract with the state failed to merit substantive due process protection).

[274] Pls.' Resp. Opp'n Mot. Dismiss at 22 n.9 [Doc. No. 13] ("Plaintiffs' claims are not based on the March 17, 2021 passage of the Ordinance."); *see also* Defs.' Reply Supp. Mot. Dismiss at 1 [Doc. No. 14] ("Plaintiffs do not . . . argue the ordinance violated due process.").

[275] Pls.' Resp. Opp'n Mot. Dismiss at 22 [Doc. No. 13]; *see also* Compl. ¶ 122 (describing the December 16, 2020 vote as "an unlawful attempt to contrive an excuse to take the Ogontz Property, and in violation of Plaintiffs' Constitutional rights"); *id.* ¶ 162 ("The December 16, 2020 decertification was a sham, was pre-determined, did not comply with fundamental notice and opportunity to be heard, and violated local, state and federal laws.").

that they have a property interest 'protected by the substantive due process clause[,] and the government's deprivation of that protected interest shocks the conscience.'"[276]

"An act is legislative in nature if it is both substantively and procedurally legislative."[277] Substantive legislation "involves either the enactment or amendment of legislation, such as policymaking or line-drawing decisions."[278] "Official acts affecting the community at-large might tip the balance in favor of a finding of legislative conduct, while acts directed at one or a few individuals might be dispositive of executive or administrative conduct."[279] As described in the public minutes from the meeting, the BOC did not adopt an ordinance or resolution decertifying Ogontz Fire during its December 16, 2020 meeting.[280] Instead, during this meeting, the BOC voted on President Daniel B. Norris's motion "to no longer recognize Ogontz Fire Company as an operating Fire Protection entity of the Township effective immediately."[281] The December 16, 2020 action was directed solely at Ogontz Fire. It stands in stark contrast to the later-adopted Ordinance No. 2423-21, which not only removed Ogontz Fire from the list of recognized fire companies, but also explicitly delineated adjustments to the duties and operations of the surviving fire companies.[282]

---

[276] *Joey's Auto Repair and Body Shop v. Fayette County*, 785 F. App'x 46, 49 (3d Cir. 2019) (quoting *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008)); *see also Newark Cab. Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018) (describing legislative and non-legislative substantive due process claims as "two very different threads").

[277] *Ne. Land Dev., LLC v. City of Scranton*, 561 F. App'x 135, 138 (3d Cir. 2014) (citing *Acierno v. Cloutier*, 40 F.3d 597, 610 (3d Cir. 1994) (en banc)).

[278] *Ne. Land Dev., LLC*, 561 F. App'x at 138.

[279] *Acierno*, 40 F.3d at 611 (quotation marks omitted) (quoting *Jodeco, Inc. v. Hann*, 674 F. Supp. 488, 494–95 (D.N.J. 1987)).

[280] Defs.' Mot. Dismiss, Ex. B at 9 [Doc. No. 11-1]; *see also* Compl. ¶ 172 [Doc. No. 1].

[281] Defs.' Mot. Dismiss, Ex. B at 9 [Doc. No. 11-1].

[282] Defs.' Mot. Dismiss, Ex. G at 2–3 [Doc. No. 11-1].

The Court need not determine at this early stage whether the December 16, 2020 decision was legislative or non-legislative. The Court similarly declines at this stage to resolve the separate (but important) question of whether the alleged harms arising from the December 16, 2020 action can be distinguished from harms caused by the March 17, 2021 ordinance adoption, the latter of which Ogontz Fire does not challenge on due process grounds. It is sufficient for Ogontz Fire to plead facts which, accepted as true, raise a plausible claim that the December decision violated Ogontz Fire's substantive due process rights. Assuming, without deciding, that the December 16, 2020 action was non-legislative—and Ogontz Fire has pleaded facts sufficient to raise such an inference—the "shocks the conscience" standard would apply rather than the "rational and non-arbitrary" standard. "The 'shocks the conscience' standard encompasses 'only the most egregious official conduct,'"[283] but the inquiry "depends upon the circumstances of a particular case."[284] Courts may find that governmental conduct shocks the conscience when there are "allegations of corruption, self-dealing, . . . or additional facts that suggest[ ] conscience-shocking behavior."[285]

The Complaint sufficiently alleges that the December 16, 2020 decision infringed upon Ogontz Fire's protected property interests—specifically, its "property rights in the Ogontz Property, the Ogontz fire house, the Indenture, the Purchase Agreement, . . . [and] funds and equipment . . . ."[286] Although there may not be a fundamental due process right to serve as a volunteer firefighter—meaning Ogontz Fire cannot state a due process claim based on its

---

[283] *Joey's Auto Repair*, 785 F. App'x at 50 (quoting *United Artists Theatre Cir., Inc. v. Township of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003)).

[284] *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999).

[285] *Chainey*, 523 F.3d at 220 (citing *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004)).

[286] Compl. ¶ 237 [Doc. No. 1].

"certification and/or license to operate as a fire company"—its other identified real property holdings are well established as fundamental and protected.[287]

Moreover, the alleged facts surrounding the December 16, 2020 vote are sufficient to raise a reasonable inference that Defendants effected the decertification in a manner that shocks the conscience. As discussed further below with respect to the procedural due process claims, Ogontz Fire alleges that the BOC, without providing any notice to Ogontz Fire or its members prior to December 16, and merely by motion rather than through the enactment of a formal ordinance or resolution, effected a decertification decision specific to Ogontz Fire which significantly infringed upon its long-standing real and personal property interests. Further discovery is necessary to clarify the background context of the December 16, 2020 meeting. Defendants' motion to dismiss will be denied as to Ogontz Fire's substantive due process claim.

b.  *Procedural Due Process*

Procedural due process requires "the state to afford an adequate level of process (notice and an opportunity to be heard) before depriving persons of a protected interest."[288] To state a claim of deprivation of procedural due process rights, a plaintiff must allege that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'"[289] A plaintiff cannot raise procedural due process claims against the

---

[287] *Nicholas*, 227 F.3d at 141 (observing that land ownership "is unquestionably 'a fundamental property interest dating back to the foundation of the American colonies' . . . [and] 'one would be hard-pressed to find a property interest more worthy of substantive due process protection than [land] ownership'" (quoting *Homar v. Gilbert*, 63 F. Supp. 2d 559, 577 (M.D. Pa. 1999); *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 601 (3d Cir. 1995)).

[288] *Mammaro v. N.J. Div. of Child Prot. and Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

[289] *Borough of Kutztown*, 455 F.3d at 233–34 (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

government, including a municipality, for legislative acts.[290] Again, however, Ogontz Fire appears to disclaim any due process theory of liability based on the March 17, 2021 adoption of the Ordinance,[291] and as previously discussed regarding Ogontz Fire's substantive due process claim, the Complaint pleads facts sufficient to suggest that the BOC's December 16, 2020 decertification decision was not a legislative act.[292]

Ogontz Fire alleges that Defendants failed to "provide any notice or opportunity to be heard to Ogontz Fire, or any of its members, or to the public, that they planned at the December 16, 2020 meeting to decertify Ogontz Fire . . . ."[293] The Complaint alleges that "[t]he agenda for the December 16, 2020 meeting contained no reference or mention of the decertification of Ogontz Fire, or any action that Ogontz Fire would no longer be recognized as an operating Fire Protection entity in the Township."[294] The meeting agenda, which is publicly available on the Township's website, supports Ogontz Fire's allegations: It contains only one entry under "Old Business" for "DCED Fire Study Follow-Up," with no mention whatsoever of Ogontz Fire, let alone any notice that decertification would be considered.[295] Likewise, the meeting minutes, which are also publicly available and referenced in the Complaint, reflect public comments from only one member of the community, with no indications that the one commenter had any

---

[290] *Rogin v. Bensalem Township*, 616 F.2d 680, 693 (3d Cir. 1980) (citing *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441 (1915)).

[291] *See* Pls.' Resp. Opp'n Mot. Dismiss at 27–29 [Doc. No. 13] (discussing only December 16, 2020 action).

[292] *Supra* sec. III.C.5.a.

[293] Compl. ¶ 174 [Doc. No. 1].

[294] *Id.* ¶ 173.

[295] Bd. of Comm'rs, Cheltenham Twp., Pa., Meeting Agenda, Dec. 16, 2020, https://www.cheltenhamtownship.org/files/documents/BoardofCommissionersAgenda12-16-20065042121120PM1680.pdf [https://perma.cc/AP2T-XLFU] (last accessed Feb. 27, 2024).

affiliation with Ogontz Fire.[296] The agenda and the minutes are consistent with Ogontz Fire's contention that the BOC did not provide a meaningful opportunity to contest decertification at the meeting.[297] For reasons consistent with those discussed above regarding the substantive due process claims—including the Court's previous analysis as to the protected property interests at issue—the Court will not dismiss Ogontz Fire's procedural due process claim at this time.[298]

6. Counts VIII–X: 42 U.S.C. §§ 1983 and 1985 Conspiracy

a. *§ 1985 Conspiracy*

Ogontz Fire brings conspiracy claims under both 42 U.S.C. § 1985 and § 1983. Subsection (3) of section 1985 "provides a cause of action if: (1) two or more persons conspire to deprive any person of the equal protection of the law; (2) one or more of the conspirators performs or causes to be performed any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States."[299] Longstanding Supreme Court precedent makes clear that "[t]he language [in § 1985(3)] requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-

---

[296] Defs.' Mot. Dismiss, Ex. B at 8–9 [Doc. No. 11-1].

[297] *Id.* at 9.

[298] The Court does not address here the Township's arguments that Plaintiffs failed to avail themselves of the procedures in the Pennsylvania First Class Township Code allowing the appeal of any resolution or ordinance of the BOC. Defs.' Mot. Dismiss [Doc. No. 11] (citing 53 Pa. Stat. § 58305-A). The Court merely observes that those procedures would not have been available if the December 16, 2020 action did not result in the adoption of a formal ordinance or resolution. Neither the February 4, 2021 complaint nor the emergency petition for a preliminary injunction filed in the Montgomery County Court of Common Pleas referenced or relied upon § 58305. Defs.' Mot. Dismiss, Exs. C, D [Doc. No. 11-1]. To be clear, the Court has not decided whether the December 16, 2020 action was in fact non-legislative; it holds only that Ogontz Fire has met its burden at this early stage of the litigation.

[299] *Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971); *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 79 (3d Cir. 1989)).

based, invidiously discriminatory animus behind the conspirators' action."[300] As previously discussed regarding Plaintiffs' claims under the Equal Protection Clause, the Complaint fails to plead sufficient facts to state a claim for racial or other class-based discrimination.[301] Accordingly, all conspiracy claims under § 1985 will be dismissed.[302]

### b.   *§ 1983 Conspiracy*

Ogontz Fire separately brings conspiracy claims under § 1983. "To demonstrate a conspiracy under § 1983, a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right . . . .'"[303] The persons must be shown to have acted under color of state law, and to have "reached an understanding" to carry out the constitutional deprivation.[304] "Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort" and is "wholly subordinate to the underlying tort's existence."[305] Therefore, in order to proceed with a conspiracy theory of liability, Ogontz Fire first must adequately allege a constitutional deprivation. The only surviving allegations of constitutional deprivations are: (1) Ogontz Fire's substantive and procedural due

---

[300] *Griffin*, 403 U.S. at 102.

[301] *Supra* sec. III.C.4.

[302] *See Farber v. City of Paterson*, 440 F.3d 131, 138 (3d Cir. 2006) (recognizing actionable claims under § 1985(3) for conspiracies motivated by discrimination on the basis of race, sex, or mental disability, but not on the basis of commercial, economic, or political animus). Plaintiffs do not raise conspiracy claims under other subsections of § 1985 untethered to the class-based discrimination requirement. *Cf. Kush v. Rutledge*, 460 U.S. 719, 724–25 (1983) (discussing conspiracy claims under other clauses of § 1985 regarding federal institutions and processes).

[303] *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)), *abrogated on other grounds by United Artists*, 316 F.3d at 400.

[304] *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2018) (quotation marks omitted) (quoting *Adickes*, 398 U.S. at 150–52).

[305] *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000) (quotation marks omitted) (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)).

process claims (arising from the December 2020 initial decertification vote); (2) its Takings Clause claim; and (3) its Contract Clause claim (arising from the Indenture). All § 1983 conspiracy claims predicated on violations of other constitutional rights will be dismissed.

"After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, 'the rule is clear that' the plaintiff 'must provide some factual basis to support the elements of a conspiracy: agreement and concerted action.'"[306] However, because "direct evidence of a conspiracy is rarely available[,] . . . the existence of a conspiracy must usually be inferred from the circumstances."[307] Defendants contend that Ogontz Fire has not properly pleaded the existence of a civil conspiracy because "a 'Township cannot conspire with itself, and . . . a government entity cannot conspire with its agents if those agents are acting in their official capacity.'"[308] Ogontz Fire responds that the alleged co-conspirators, who it contends need not all be named as defendants for purposes of this suit, acted outside the scope of their official duties as employees of the Township.[309]

Most important here, even if Ogontz Fire has sufficiently pleaded that certain Township officials—specifically, the Lynch brothers, then-Township Manager Robert Zienkowski, "and others named and unnamed herein"[310]—acted in their personal capacities in perpetuating the alleged conspiracy, none of those individuals has been named as a defendant in this lawsuit. Furthermore, even if Plaintiffs are correct that only some members of an alleged conspiracy need

---

[306] *Jutrowski*, 904 F.3d at 295 (quoting *Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 184–85 (3d Cir. 2009)).

[307] *Capogrosso*, 588 F.3d at 184 (quoting *Crabtree v. Muchmore*, 904 F.2d 1475, 1480–81 (10th Cir. 1990)).

[308] Defs.' Mot. Dismiss at 30 [Doc. No. 11] (quoting *Fred's Mod. Contracting, Inc. v. Horsham Township*, No. 02-0918, 2004 WL 620060, at *7 (E.D. Pa. Mar. 29, 2004)).

[309] Pls.' Resp. Opp'n Mot. Dismiss at 40 [Doc. No. 13] (quoting *Jacobs v. Pa. Dep't of Corr.*, No. 04-1366, 2011 WL 2295095, at *12 (W.D. Pa. June 7, 2011)).

[310] Compl. ¶ 334 [Doc. No. 1].

be named for liability to attach, a § 1983 conspiracy claim cannot proceed solely by naming a municipality and its subordinate bodies, as such entities are immune from suit absent a showing of an *official* policy, practice, or custom.[311] Accordingly, Ogontz Fire's § 1983 civil conspiracy claims premised on alleged violations of its substantive due process, procedural due process, Takings Clause, and Contract Clause rights will be dismissed without prejudice.[312]

### 7. Statute of Limitations

Defendants contend that certain of Plaintiffs' § 1983 claims are barred by the statute of limitations.[313] "In determining the length of the statute of limitations for a claim arising under § 1983, courts must apply the limitations period applicable to personal-injury torts in the State in which the cause of action arose."[314] Therefore, there is a two-year statute of limitations for bringing a § 1983 claim arising in Pennsylvania.[315] Because a § 1983 cause of action's accrual date is governed by federal law,[316] the Third Circuit has held that "the statute of limitations begins to run[ ] 'when the plaintiff knew or should have known of the injury upon which its action is based.'"[317] The test is an objective inquiry; a court must determine "what a reasonable person should have known," not what a plaintiff "actually knew."[318] "As a general matter, a

---

[311] *Supra* sec. III.B.

[312] Ogontz Fire asserts Count X ("Civil Conspiracy") separately from its conspiracy claims under § 1983 and § 1985. That count re-pleads the same violations of federal constitutional rights as the other conspiracy counts.

[313] Defs.' Mot. Dismiss at 11 [Doc. No. 11].

[314] *Est. of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 859 (3d Cir. 2014) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)).

[315] *Kach v. Hose*, 589 F.3d 626, 634 (citing 42 Pa. Cons. Stat. § 5524(2); *Kost v. Kozakiewicz*, 1 F.3d 176, 189–90 (3d Cir. 1993)).

[316] *Kach*, 589 F.3d at 634 (citing *Genty v. Resol. Tr. Corp.*, 937 F.2d 899, 919 (3d Cir. 1991)).

[317] *Kach*, 589 F.3d at 634 (quoting *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998)).

[318] *Kach*, 589 F.3d at 634 (citing *Barren v. United States*, 839 F.2d 987, 990 (3d Cir. 1988)).

cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury."[319]

On December 14, 2022, the parties executed a Tolling Agreement containing a 60-day extension for Plaintiffs to bring their potential claims.[320]  The Complaint was filed on February 13, 2023, one day after the end of the tolling period.[321] Defendants contend that any causes of action which accrued on or before December 14, 2020 (two years before the execution of the Tolling Agreement) are time barred.[322] The Court has dismissed most of the claims arising from the conduct pre-dating December 14, 2020, as identified by Defendants in their briefings: (1) the denial of the Ogontz Captain's internal promotion request; (2) the denial of the LaMott Deputy Chief's transfer request; (3) the retaliation for how Ogontz Fire chose to discipline its Lieutenant; and (4) the general deprivation of minority representation.[323] The Court therefore need not address the statute of limitations arguments as to the already dismissed claims.

The Court will not dismiss Ogontz Fire's surviving claims under the Due Process Clause, Takings Clause, and Contract Clause on statute of limitations grounds. The last events necessary to complete those violations were the December 16, 2020 and March 17, 2021 BOC actions, both of which occurred after December 14, 2020.[324]

---

[319] *Id.* (citing *United States v. Kubrick*, 444 U.S. 111, 120 (1979)).

[320] Defs.' Mot. Dismiss, Ex. H [Doc. No. 11-1] (Tolling Agreement).

[321] Compl. [Doc. No. 1].

[322] Defs.' Mot. Dismiss at 11 [Doc. No. 11].

[323] *See id.*

[324] This does not mean that earlier conduct is irrelevant to the surviving claims, particularly for purposes of developing the factual record. The Court's decision should not be construed as prematurely limiting discovery which is relevant to the remaining constitutional claims.

### D.  Pennsylvania State Law Claims

1. <u>Count XIII: Negligence</u>

Plaintiffs bring a state-law negligence claim. In Pennsylvania, a plaintiff alleging

negligence must establish the following elements: (1) the defendant owed the plaintiff a duty;

(2) the defendant breached the duty; (3) the plaintiff suffered actual harm; and (4) a causal

relationship existed between the breach of duty and the harm.[325] Under the Political Subdivision

Tort Claims Act ("PSTCA"), municipalities and their employees are immune from liability for

civil torts, subject only to a few narrow exceptions.[326] The PSTCA states, in pertinent part:

> Except as otherwise provided in the subchapter, no local agency shall be liable for
> any damages on account of any injury to a person or property caused by any act of
> the local agency or an employee thereof or any other person.[327]

The Act only waives immunity when the following conditions are met: (1) the damages

alleged would otherwise be recoverable under common law or a statute; (2) an injury was caused

by a negligent act of a local agency or employee acting within the scope of his official duties;

and (3) the negligent act of the local agency falls within one of the nine enumerated categories:

> (1) . . . The operation of any motor vehicle in the possession or control of the local
> agency . . . (2) . . . The care, custody or control of personal property in the
> possession or control of the local agency . . . (3) . . . The care, custody or control
> of real property in the possession of the local agency . . . (4) Trees, traffic controls
> and street lighting . . . (5) Utility service facilities . . . (6) Streets . . . (7) Sidewalks
> . . . (8) Care, custody or control of animals . . . [or] (9) Sexual abuse.[328]

---

[325] *French v. Commonwealth Assocs., Inc.*, 980 A.2d 623, 630–31 (Pa. Super. Ct. 2009).

[326] 42 Pa. Cons. Stat. Ann. § 8541.

[327] *Id.*

[328] *Id.* § 8542.

The exceptions to immunity are to be "strictly and narrowly construed.[329] Plaintiffs

broadly assert, without further elaboration, that Defendants "owed a duty to Plaintiffs to conduct

themselves in a proper, lawful and reasonable manner, and in a manner that would not harm

Plaintiffs," and that Defendants "breached their duty . . . ."[330] Plaintiffs do not cite any of the

enumerated exceptions to governmental immunity. None of the alleged facts, accepted as true,

fall under any of the enumerated exceptions. Therefore, the Township and the BOC are immune

from liability and the state-law negligence claim will be dismissed.[331]

    2.   Counts XI–XII: Breach of Contract and Tortious Interference with Contract

Plaintiffs also bring claims for breach of contract and tortious interference with contract.

"[T]he PSTCA applies solely to tort claims, not breach of contract claims."[332] The tortious

interference claim is, as the name suggests, a tort claim under Pennsylvania law, therefore

Defendants are immune from suit under the PSTCA for the reasons discussed above.[333] The

tortious interference with contract claim will be dismissed.

The Court next considers the breach of contract claim. "Under Pennsylvania law, a

breach of contract claim must contain three elements: '(1) the existence of a contract, including

---

[329] *Sugalski v. Commonwealth*, 569 A.2d 1017, 1019 (Pa. Commw. Ct. 1990); *see also Southersby Dev. Corp. v. Township of South Park*, No. 14-1248, 2015 WL 1757767, at *10 (W.D. Pa. Apr. 17, 2015).

[330] Compl. ¶¶ 399–400 [Doc. No. 1].

[331] *Schwartz v. Lackawanna County*, No. 21-1645, 2022 WL 22270779, at *9 (M.D. Pa. June 21, 2022) ("A prison board and county board of commissioners also constitute local agencies within the purview of the PSCTA." (citing *Mason v. Dauphin Cnty. Prison*, No. 14-1680, 2015 WL 6751015, at *8 (M.D. Pa. Nov. 5, 2015))).

[332] *Edison Learning, Inc. v. Sch. Dist. of Phila.*, 56 F. Supp. 3d 674, 680 (E.D. Pa. 2014) (citing *Meyer v. Cmty. Coll. of Beaver Cnty.*, 2 A.3d 499, 503 (Pa. 2010)); *see also Kostin v. Bucks Cmty. Coll. (Nursing Dep't)*, No. 21-850, 2022 WL 952729, at *13 (E.D. Pa. Mar. 30, 2022).

[333] *See CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 385 (3d Cir. 2004) (discussing privileges relating to "the tort of interfering with [a] contract," as distinct from a "breach of contract"); *East Rockhill Township v. Richard E. Pierson Materials Corp.*, 386 F. Supp. 3d 493, 502 n.9 (E.D. Pa. 2019) (stating that plaintiff bringing a tortious interference with contract claim had "asserted a tort claim, subject to the provisions of the Political Subdivision Tort Claims Act").

its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.'"[334] As previously discussed with respect to Ogontz Fire's § 1983 claim under the Contract Clause, the Complaint sufficiently pleads the existence and terms of the Indenture, which is a contract with the Township. Ogontz Fire has also adequately pleaded that the Township had a duty under the Indenture not to interfere with Ogontz Fire's general right to use the parcel of land on which the firehouse is built (even if not specifically to fight fires), and that Defendants breached the duty by decertifying Ogontz Fire (based on the BOC's interpretation of what the decertification meant as to Ogontz Fire's property). Finally, the alleged facts are sufficient to support that Ogontz Fire would suffer damages, particularly given the monetary investments it made in reliance on its assumed right to use the land until at least 2073.

As also stated with respect to the Contract Clause claim, Ogontz Fire has not sufficiently pleaded the existence of an existing contractual relationship under the Lease-Purchase Agreement, because the parties' obligations under that Agreement were satisfied upon the purchase and transfer of the firehouse. Accordingly, Defendants' motion to dismiss will be granted as to the state-law breach of contract claim arising from the Lease-Purchase Agreement, but denied as to the breach of contract claim arising from the Indenture.

## IV.   CONCLUSION

Firefighting is an essential public service, as consistently recognized by federal and state courts and repeatedly acknowledged in this Opinion. Cheltenham Township, like other municipalities in the Commonwealth of Pennsylvania, has a duty to ensure that its firefighting capabilities are up to snuff. That responsibility necessarily includes the ability to regulate the

---

[334] *Cornell Cos., Inc. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 265 (E.D. Pa. 2007) (quoting *CoreStates Bank, Nat'l Ass'n v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

operations of local firefighting entities, whether they be public agencies or private volunteer groups. Municipal bodies cannot, however, disregard important procedural rules and claim *ex post* that the ends justify the means. Nor can municipalities enact regulations that may have infringing effects on a private entity's real and personal property interests without taking appropriate care to prevent governmental overreach.

For the reasons stated herein, Defendants' motion to dismiss will be granted in part and denied in part. Arthur Gordon, the Board of Commissioners of Cheltenham Township, and the Cheltenham Township Fire Board will be dismissed from this litigation. Counts II–IV, VII, and XI remain. An appropriate order follows.